## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RAYMOND A. LONG, M.D.            )
421 West Church Street           )
Unit 713                         )
Jacksonville, FL 32202           )
                                 )
    Plaintiff,               )         Civil Action No.
                                 )
    v.                       )
                                 )
ALEX AZAR, Secretary of United States   )
Department of Health and Human Services )
200 Independence Avenue, S.W.    )
Washington, D.C. 20201,          )
                                 )
and                              )
                                 )
UNITED STATES DEPARTMENT OF      )
HEALTH AND HUMAN SERVICES        )
200 Independence Avenue, S.W.    )
Washington, D.C. 20201,          )
                                 )
    Defendants.              )
                                 )

**COMPLAINT AND PETITION FOR PRELIMINARY**

**AND PERMANENT INJUNCTIVE RELIEF AND FOR MANDAMUS**

1. Plaintiff Raymond A. Long, M.D., through undersigned counsel, seeks preliminary and permanent injunctive relief against Alex Azar, in his capacity as Secretary of the United States Department of Health and Human Services, and against the United States Department of Health and Human Services in its own name. Mandamus is also sought against the same parties for the same relief.

**JURISDICTION AND VENUE**

2. Jurisdiction in this Court is based on 5 U.S.C. § 701, *et. seq.*, the Administrative Procedure Act (the "APA"), and 28 U.S.C. § 1331, in that the Complaint seeks review of a final United States agency action made reviewable by statute for which there is no other adequate remedy in any court of competent jurisdiction, and the rights of action alleged herein arise under the Constitution and laws of the United States.

3. Venue is appropriate in the District of Columbia pursuant to 28 U.S.C. § 1391(e)(1)(B) in that Defendant United States Department of Health and Human Services is an agency of the United States based in Washington, D.C., and Defendant Alex Azar is an officer of aforesaid agency acting in his official capacity.

**PARTIES**

4.  Plaintiff Raymond A. Long, M.D., ("Dr. Long") is a medical doctor practicing and residing in Jacksonville, Florida.

5.  Defendant United States Department of Health and Human Services ("HHS") is a cabinet-level agency of the United States government.

6.  Defendant Alex Azar ("the Secretary") is sued in his capacity as Secretary of the Department of Health and Human Services. The Department of Health and Human Services administers a program known as the National Practitioner Data Bank ("the NPDB"), whereby derogatory information regarding medical practitioners is maintained and disseminated in response to queries from hospitals and other entities.

## FACTUAL BACKGROUND

### Dr. Long's Educational and Career Background

7.  Dr. Long earned a Bachelor of Arts (B.A.) degree in Biology, Cum Laude, from Point Loma College in San Diego, California, where he was a member of both the Honor Roll and the Sigma Phi Mui Honor Society. He earned a Doctor of Medicine (M.D.) degree from the University of Michigan Medical School.

8.  Dr. Long completed a residency program in orthopedic surgery at the University of Montreal, in Montreal, Quebec.

9.  Dr. Long then completed a series of distinguished fellowships: The first in orthopedic arthroscopy and arthroplasty at the University of Montreal, in Montreal, Quebec; the second in orthopedic shoulder and elbow reconstruction at the Florida Orthopedic Institute in Tampa, Florida; the third in orthopedic sports medicine, again at the Florida Orthopedic Institute in Tampa, Florida; the fourth in orthopedic sports medicine at the

Henry Ford Hospital in Detroit, Michigan; and the fifth in orthopedic trauma fellowship at the Hughston Foundation in Columbus, Georgia. Dr. Long's fellowship at the Henry Ford Hospital in Detroit, Michigan was accredited by the prestigious Accreditation Council for Graduate Medical Education (ACGME), and on his post-fellowship examination administered by the American Orthopaedic Society for Sports Medicine (AOSSM), an exam with a national average score of 78.87%, Dr. Long scored an impressive 95.2%.

10. Dr. Long is Board Certified by the National Board of Medical Examiners (Parts I, II, and III), is a Fellow of the Royal College of Surgeons in Canada and is board eligible for the American Board of Orthopedic Surgery. He is a member of the Orthopedic Trauma Association and is licensed to practice medicine in California, Florida, Michigan, Georgia, Utah, Indiana, and New York.

11. Dr. Long has an extensive employment history as a physician. He was a staff physician in family and emergency medicine at Kaiser Permanente Hospital in San Diego, California; a fellow and resident in orthopedic surgery at the Centre Hopitalier de L'Universite de Montreal in Montreal, Quebec; a fellow and junior attending surgeon at the Tampa General Hospital University Community Hospital, part of Florida Orthopedic Institute in Tampa, Florida; a staff orthopedic surgeon at Northwest Orthopedics in St. Albans, Vermont; a fellow at Henry Ford Hospital in Detroit, Michigan; a staff physician and fellow in orthopedic trauma at the Midtown Medical Center in Columbus, Georgia; an orthopedic surgeon at the Hughston Orthopedic Trauma Surgeons for Memorial Hospital in Jacksonville, Florida.

12. Dr. Long has given several presentations on orthopedic surgical issues at the University of Montreal in Quebec. He gave a presentation entitled "Spinography as a noninvasive method to objectively evaluate lower back pain" at the University of Montreal, Department of Orthopedic Surgery's Orthopedic Research Day as part of the Programme Edouard-Samson. At the same event and venue in years following, Dr. Long presented an evaluation of clinical correlation of dynamic ultrasound imagining of the shoulder, and an in vitro evaluation of an anterior cruciate ligament reconstruction. His final presentation was awarded Second Prize in Clinical Research by Ceraver Osteal.

13. Dr. Long has contributed to medical academia through his clinical research in the treatment of three- and four-part proximal humerus fractures during his time at the Florida Orthopedic Institute's Department of Shoulder and Elbow Reconstruction; through his educational article, "Damage Control Orthopedics," which was accepted for publication by the Hughston Foundation; and through his contribution to an educational video entitled, "The Posterolateral Approach to the Ankle for Posterior Malleolar Fractures," which was presented at the Orthopedic Trauma Association's Annual Meeting in 2017.

14. Dr. Long has also written six best-selling books for the lay public on the subjects of anatomy and biomechanics, which have been translated into ten languages and distributed worldwide.

Background of Relevant Non-Parties

15. At all relevant times, Northwestern Medical Center ("NMC") was a private, not-for-profit hospital incorporated in Vermont, with its principal place of business at 133 Fairfield

Street, St. Albans, Vermont. At all relevant times, NMC was managed on a contractual

basis by Quorum Health Resources, LLC, ("QHR") a corporation incorporated in

Delaware with its principal place of business at 5800 Tennyson Parkway, Plano, Texas

85024. QHR is a subsidiary of Triad Hospitals, Inc. Triad Hospitals, Inc. ("Triad") is

QHR's parent company, is incorporated in Delaware and has its principal place of

business at 5800 Tennyson Parkway, Plano, Texas 75024.

16. At all relevant times, Peter Hofstetter ("Hofstetter") served as an employee, agent, and/or

servant of Triad and/or QHR, and Chief Executive Officer of NMC, and his actions, as

alleged in the complaint, were whin the scope of his employments and/or as an agent for

the relevant entitiy.

17. At all relevant times, Dr. Jacques Archambault, M.D., ("Archambault") was an

orthopedic surgeon practicing at NMC and in the St. Albans, Vermont, geographic area;

he was therefore in direct economic competition with Dr. Long. Dr. Archambault, at all

relevant times, enjoyed Active Staff Privileges at NMC.

18. At all relevant times, Michael Burfoot, B.M., B.C.H. ("Burfoot") was an anesthesiologist

and NMC's Chief of Surgery, as well as a close associate and personal friend of

Archambault. Burfoot's group anesthesiology practice also included Dr. Stephen Mason,

M.D. ("Mason"), Dr. Williams Roberts, M.D. ("Roberts") and Dr. Roland Adamsons,

M.D. ("Adamsons"), all anesthesiologists.


Long v. QHR and NMC: Background

19. On or about July 2, 2013, in the United States District Court for the District of Vermont, Case No. 2:13-CV-189, Dr. Long filed suit against Quorum Health Resources ("QHR") and Northwestern Medical Center ("NMC"), alleging the following:

20. In September 2001, Dr. Long obtained privileges to perform surgery and otherwise conduct his practice as a surgeon at NMC.

21. In or around Fall 2002, Dr. Long was contemplating building a MRI machine in his office. He informed persons associated with NMC, including, *inter alia*, Robert Beattie, M.D. ("Beattie"), Foerster, and Archambault, of his idea and his belief that he should consult an attorney to ensure compliance with federal anti-kickback laws.

22. At that time, NMC was involved in an illegal kickback scheme with respect to x-ray facilities. As described in a Department of Justice press release concerning the matter, NMC was paying above-market rent to an orthopedic doctor's office in St. Albans, in exchange for the doctor providing the hospital with a space in his or her office in which the hospital provided x-ray services to the doctors' patients. By paying the doctors above-market rates, anti-kickback laws were implicated.

23. Unknown to Dr. Long at the time, NMC was planning to have its own MRI machine built for the hospital and wanted to prevent any competition for business that would have arisen from Dr. Long having his own MRI machine in the St. Albans market.

24. In 2002, when Dr. Long expressed his intention to seek legal counsel to ensure his compliance with federal anti-kickback prohibitions, QHR and NMC wanted to hide their illegal activities.

25. QHR and NMC, by and through their employees and agents, in order to preclude business competition and destroy Dr. Long's reputation and ability to practice his profession in the

St. Albans, Vermont market and elsewhere, undertook actions deliberately designed to subject him to fraudulent and malicious peer review and eventual reporting to the National Practitioner Data Bank

26. The most egregious of the aforesaid actions was using bacteria purchased by NMC and/or its agents or employees, to cause a series of life- and limb-threatening surgical infections to Dr. Long's patients, and then use those infections as false pretense for a fraudulent and malicious peer review of Dr. Long, as set forth in more detail below.

27. In 2003, during Hofstetter's tenure as NMC's CEO, an unknown subject deliberately contaminated several of Dr. Long's surgical irrigation fluids with bacteria acquired by NMC approximately two weeks before aforesaid surgeries, causing life- and limb-threatening infections in several of Dr. Long's patients, at least one of which resulted in serious permanent bodily injury to the patient.

28. Shortly after the cluster of infections struck his surgical patients, Dr. Long sent a sample of the irrigation solution provided by NMC for his surgeries to be tested at the University of Vermont microbiology laboratory. The sample was conclusively found to be heavily contaminated with the deadly bacterium *Staphylococcus aereus*.

29. As discussed in greater detail below, Hofstetter and others at NMC used the deliberately caused infections in Dr. Long's patients as the foundation for a fraudulent peer review of Dr. Long.

30. In 2011, Dr. Long retained former Centers for Disease Control and Prevention infection investigator William R. Jarvis, M.D. ("Jarvis") to investigate the most likely origin of the bacteria causing surgical site infections ("SSIs") in Dr. Long's patients in late 2003.

31. Dr. Jarvis used antibiotic sensitivities, which are like a fingerprint, to match the bacteria the hospital had purchased prior to the infections with the bacteria cultured from Dr. Long's patients, thereby confirming that the infections were caused by deliberate contamination of Dr. Long's surgeries.

## Long v. QHR and NMC: The Jarvis Report

32. Jarvis completed a report listing his credentials; the materials he reviewed in preparing his report; case backgrounds and his own assessments for each of Dr. Long's patients who suffered surgical infections during the relevant time; additional information about NMC's possession of the bacteria, the properties of the bacteria, and his professional opinion on the source of the contamination.

33. Jarvis graduated from the University of Texas, Houston School of Medicine in 1974, after which he completed a residency in Pediatrics at Children's Hospital in Los Angeles, a Pediatric Infectious Disease fellowship at the Hospital for Sick Children in Toronto, Ontario, Canada, and a Pediatric Infectious Disease, Virology and Epidemiology fellowship at the Yale University School of Medicine.

34. From 1980 to 2003, Jarvis held a number of leadership positions at the Centers for Disease Control and Prevention ("CDC") in Atlanta, Georgia. These positions included Chief of Epidemiology Branch, Chief of Investigation and Prevention Branch, Assistant Chief of National Nosocomial Infections Surveillance system, Acting Director of the Hospital Infections Program ("HIP"), Assistant Director for Program Development for the Division for Healthcare Quality Promotion, and Director for Extramural Research, Office of the Director, National Center for Infectious Diseases.

35. For seventeen years, Jarvis served at HIP as the supervisor of the conduct of outbreak investigations and epidemiologic studies in healthcare facilities. During this time, he supervised conduction of a large number of onsite outbreak investigations, solved all of them, and published greater than 90 percent of them.

36. While serving at HIP, Jarvis was responsible for the development, supervisions, and publication of all CDC Guidelines for the Prevention of Healthcare-associated Infections ("HAIs").

37. Jarvis has personally written numerous papers or chapters on the conduct of outbreak investigations in healthcare settings. As of his 2011 report regarding Dr. Long's cases, he had 413 peer-reviewed publications, had edited five books (including the book Hospital Infections, 6th ed.), and received numerous awards for my work in the field of healthcare epidemiology and infection control, including the CDC's Lifetime Achievement Award for Scientific Achievement (2003) and the CDC's Lifetime Achievement Award in Epidemiology (2010). He served as the editor of Infection Control and Hospital Epidemiology, the official journal of the Society for Healthcare Epidemiology of America.

38. Jarvis has served as Chair of the American Society for Microbiology's Division L (Nosocomial infections), President of the Society for Healthcare Epidemiology of America, and President of the Association for Professionals in Infection Control and Epidemiology, Inc. Research Foundation.

39. Jarvis has served as a faculty member of the Emory University School of Medicine as a Clinical Associate Professor in the Department of Pediatric Infectious Diseases,

Immunology and Epidemiology, and as an Assistant Professor in the Rollins School of Public Health.

40. As of his 2011 reported regarding Dr. Long's cases, Jarvis was serving as Chair of the Food and Drug Administration's Hospital and Personnel Uses Devices Committee.

41. Jarvis reviewed the following materials in preparation for his report regarding Dr. Long's cases:

    a.  NMC medical records of four patients who developed SSIs from October to December 2003;

    b.  Some of the documents from the NMC "peer review" of Dr. Long;

    c.  Dr. Corsetti's review of the above patients' medical records and his "assessment" of the cause of their SSIs, done at NMC's request;

    d.  The FAHC irrigation fluid reports from McQuesten, i.e. cultures of supposedly sterile irrigation fluid provided to Dr. Long by NMC personnel in the operating room on February 6, 2004;

    e.  NMC's orders of bacteria from Becton-Dickinson of Cardinal;

    f.  The Brecher 080418 Manchester, McQuesten Bailey result;

    g.  Discovery responses from NMC indicating that they possessed *Staphylococcus marcescans* bacteria for quality assurance testing or proficiency testing;

    h.  Report from Dr. Kathleen Kirkland ("Kirkland") assessing SSI clusters;

    i.  Sections of the deposition of Kirkland in connection with Dr. Long's aforesaid lawsuits;

    j.  Results of cultures of NMC-provided lactated ringers solution provided to Dr. Long in the operating room during a procedure performed on February 6, 2004

and processed by the Dartmouth Medical Center microbiology laboratory (positive for two colony types of *Staphylococcus aereus*);

k.  Court documents which show that NMC purchased orders for bacteria (*Staphylococcus aereus, Staphylococcus epidermidis, Pseudomonas aeruginosa*);

l.  Expert review of the aforesaid MRI which Dr. Long alleges was altered to remove a needle track damaging the spinal cord, provided by Dr. Long; and

m.  Emails and discussions with Dr. Long about his general practice, previous surgical site infection rates, the patients involved, practices in the operating room, and sterilization of medical equipment and operating room practices at NMC, and his pre-surgical routine and surgical practices and procedures.

42. Jarvis' report notes that, *inter alia*, given the fact that so many SSIs occurred in very low-risk arthroscopic joint procedures in such a short timeframe, and the unusual types of bacteria involved, the likelihood that the SSIs were caused by (1) the patient's flora; (b) contaminated surgical equipment; (c) Dr. Long's surgical technique; (d) breaks in sterile technique by other operating room personnel; or (e) contamination of Marcaine placed in the pain pumps, as hypothesized by Dr. Corsetti ("Corsetti") in his peer review of the cases, is "exceedingly unlikely."

43. Jarvis' report notes that none of the hypotheses raised by Corsetti would explain how two different morphologies of *Staphylococcus aereus* could be found in a sterile irrigation fluid provided in the operating room of NMC for use by Dr. Long.

44. Jarvis' report notes that none of the hypothesis raised by Corsetti would explain the different species of bacteria involved, or why other SSIs were not concurrently occurring in the patients of other surgeons, including other orthopedic surgeons, with the same

organisms at the same time, because the same central supply would be sterilizing all surgical equipment and the same central supply or pharmacy would be providing the sterile fluids and medications for all surgical procedures.

45. Jarvis' report notes that if the sterilizers were failing, or if there was intrinsic contamination of fluids, then patients of other surgeons at the same institution would have similar SSIs. In response to the hypothesis that the SSIs resulted from the patients' own flora, Jarvis' report further notes that the skin preparations for all patients was according to CDC recommendations, and furthermore that neither *Staphylococcus marcescens* nor *Pseudomonas aeruginosa* are commonly recovered from normal skin.

46. Jarvis' report notes that SSIs associated with patients' skin flora, Dr. Long's operative technique, other operating room personnel, or contamination of Marcaine or other medications or equipment should occur randomly and not be clustered over a four-week period, especially after the preceding 11-12 months yielded no SSIs.

47. Jarvis' report notes that the bacteria causing the SSIs in Dr. Long's patients differed in their origin and mode of transmission. For example, *Staphylococcus marcescens* is not a common human intrinsic organism and is almost always associated with exposure to water or other fluid containing it; in contrast, *Staphylococcus aereus* is a common human skin colonizer.

48. Jarvis' report notes that the antibiotic sensitivities for the bacteria cultured from Dr. Long's patients were highly unusual for bacteria that typically cause infections in modern hospitals, in that the bacteria were sensitive to antibiotics to which bacteria that typically cause infections in modern hospitals are resistant.

49. Jarvis' report notes that the antibiotic sensitivities for the bacteria cultured from Dr. Long's patients matched the antibiotic sensitivities of the biological supply house bacteria purchased or otherwise acquired by NMC in the weeks before the infections struck Dr. Long's patients.

50. The antibiotic sensitivities of the bacteria that caused the infections in Dr. Long's patients and the bacteria that NMC purchased or acquired as aforesaid are those of bacteria that have never been exposed to antibiotics and thus never developed resistance.

51. Jarvis' report concludes that "[a] much more likely explanation of how the operating room irrigation fluid became contaminated and how the 3-4 SSIs above occurred is that the patients were intentionally infected through extrinsically and intentionally contaminated irrigation fluid (or other fluids, medications, equipment or materials) provided by NMC personnel and used by Dr. Long in the surgical procedures of these patients."

Additional Actions Taken by QHR/NMC to Harm Dr. Long by Generating Pretense for Fraudulent and Malicious Peer Review and Eventual NPDB Reporting

52. In addition to deliberately infecting Dr. Long's patients with bacteria purchased by the hospital and fraudulently and maliciously attempting to destroy his career by falsely blaming him for aforesaid infections, from 2001 to 2004, Triad Hospitals, QHR, and NMC, by and through their agents and employees, undertook numerous other actions designed to generate pretense for fraudulent and malicious peer review and eventual NPDB reporting.

53. Paragraphs 49 – 327 are a summary of allegations made in *Long v. Triad Hospitals, et. al.*, which was filed on or about September 28, 2006 in the United States District Court for the District of Vermont, Case No. 2:05-CV-21. In 2008, the case settled for approximately $4 million.

54. Effective on or around September 10, 2001, NMC granted Dr. Long Provisional Privileges, to be effective for one year, to perform surgery and otherwise conduct his practice as a surgeon at NMC. Dr. Long was an employee of Dr. Bruce Foerster ("Foerster") of Northwest Orthopedics in St. Albans, Vermont.

55. At the end of the one-year period of Provisional Privileges at NMC, which began on or about September 10, 2001, Dr. Long was to apply for Active Staff Privileges, by which he would be allowed to perform surgery and otherwise conduct his practice as a surgeon a NMC for a period of two years.

56. On or about January 25, 2002, Dr. Long performed arthroscopic surgery on the shoulder of Patient A at NMC, which included an interscalene nerve block administered by anesthesiologist Roberts. Within twenty-four hours of surgery, Patient A became quadriplegic in that he was paralyzed in all four extremities.

57. Medical testing and a formal neurologic consultation conducted at Dr. Long's direction confirmed that Patient A's quadriplegia resulted from the interscalene nerve block performed by Roberts.

58. Dr. Long advised Patient A that the testing indicated that the patient's quadriplegia resulted from the interscalene nerve block administered by Roberts; he further requested a review of Patient A's surgery by the Surgical Service Subcommittee for Quality Assurance ("SSSQA").

59. Robert, on the other hand, attempted to mislead Patient A into believing that a surgical error by Dr. Long had caused the paralysis, despite the fact that neurological consultation had conclusively shown the paralysis to be an anesthetic complication.

60. On or about January 27, 2002, Dr. Long prepared to perform a complex emergency surgery at NMC. As was his practice, Dr. Long began setting up the operating room and conducting a dry run of the surgery before the patient was brought in, to ensure proper placement of all necessary instruments and thereby minimize the possibility of error.

61. While Dr. Long was preparing the operating room and conducting the dry run, Burfoot, NMC's Chief of Surgery and the anesthesiologist assigned to the case, brought the patient into the operating room early. Dr. Long asked Burfoot to remove the patient until Dr. Long had finished setting up the operating room and conducting the dry run.

62. Burfoot refused to remove the patient and allow Dr. Long to finish properly setting up the operating room and conducting his dry run. Nevertheless, Dr. Long performed the surgery successfully.

63. During the surgery, Dr. Long advised Burfoot that he had acted inappropriately and unprofessionally, to which Burfoot angrily stated, *inter alia*, that Dr. Long should "stop fucking around!"

64. After the surgery, Dr. Long reported Burfoot's unprofessional conduct to Foerster, the orthopedic surgery representative to SSSQA. Foerster subsequently advised Burfoot that Burfoot had acted unacceptably and unprofessionally.

65. Burfoot and NMC's Surgical Services Nurse Manager, Sandra Chagnon ("Chagnon"), complained to Hofstetter, the CEO of NMC and not a physician, about Dr. Long.

66. On or about February 1, 2002, approximately five days after Burfoot's unprofessional and inappropriate conduct, Dr. Long sought out Burfoot for a discussion about the incident, in an effort to reconcile their professional relationship. The meeting left Dr. Long under the impression that both he and Burfoot would put the incident behind them and continue on as colleagues.

67. Unknown at the time to Dr. Long, Burfoot was responsible for making quarterly reports concerning Dr. Long's conduct and performance, in Burfoot's capacity as NMC's Chief of Surgery.

68. Burfoot's next quarterly report approvingly noted that Dr. Long had spontaneously sought out Burfoot to reconcile the relationship after the January 27, 2002 incident. Further quarterly reports by Burfoot note that Dr. Long's relationships with operating room staff had dramatically improved.

69. Dr. Long continued to see Patient A for follow-up care; Patient A continued to be greatly debilitated by his remaining paresis, although his quadriplegia did improve.

70. Patient A advised Dr. Long that the paresis had rendered Patient A unable to work and therefore unable to pay his surgery bills.

71. Dr. Long requested Roberts, the former Secretary to the Medical Staff and Chief of NMC's Anesthesia Department, to arrange for cancellation of Patient A's bill from NMC. Roberts later stated that he had arranged cancellation of Patient A's NMC medical bill through Hofstetter.

72. Nevertheless, NMC continued to bill Patient A for his surgery, despite his inability to work caused by the improperly administered interscalene nerve block.

73. Upon learning that NMC was continuing to bill Patient A for the surgery, Dr. Long requested a copy from Roberts, in order to review and possibly reduce the bill. Roberts refused to produce a copy of the bill.

74. On or about March 30, 2002, Dr. Long advised Patient A that his paresis was caused by an anesthetic complication and further advised Patient A to bring an action for medical malpractice rather than have his life financially destroyed by the surgical bill that NMC insisted on collecting from a patient rendered paralyzed through Roberts' error.

75. On or about March 31, 2002, Dr. Long advised Roberts, Burfoot's partner, of his advice to Patient A on or about the previous day, as set forth in the preceding paragraph.

76. In light of Patient A's catastrophic result, Dr. Long became concerned about the severity of risk posed to his patients by the use of interscalene nerve blocks by NMC anesthesiologists.

77. To help assess the risks to his patients, Dr. Long asked Roberts what the complication rate was at NMC for interscalene nerve blocks; Roberts was evasive and did not answer.

78. To help assess the risks to his patients, Dr. Long asked Adamsons (anesthesiologist-partner of both Burfoot and Roberts) if he was familiar with the type of anesthesia related complication that had resulted in Patient A's paresis. Adamsons was evasive and claimed he had never heard of such a complication.

79. Dr. Long's one-year Provisional Privileges at NMC were set to expire on September 10, 2002.

80. In violation of NMC Medical Staff by-laws, Dr. Long was never provided the necessary documents to apply for Active Staff Privileges.

81. On or about October 23, 2002, Dr. Long performed emergency surgeries on Patient B and Patient C, both of whom had fractured bones. The surgeries were complex and lasted all night. After working through the night, Dr. Long needed assistance to complete the surgeries.

82. Archambault was the orthopedic surgeon on call at NMC at that time, and he took over Patient C's surgery and incompetently, negligently, and improperly positioned a surgical nail over Patient C's broken bone, pounded it and thereby split the bone, making Patient C's condition worse.

83. Dr. Long immediately relieved Archambault, repaired the damage Archambault had caused, and successfully completed the surgery. Dr. Long finished Patient B and Patient C's surgeries in the late morning of October 24, 2002.

84. Upon exiting the operating room and subsequently thereto, Archambault falsely and maliciously attempted to blame Dr. Long for the error he himself caused.

85. Patient B and Patient C's emergency surgeries had disrupted NMC's elective surgical schedule, costing NMC lost profits from privately paid surgeries; additionally, since Patient B and Patient C were insured by Medicaid, their emergency surgeries reduced NMC's profit margin.

86. Dr. Long told Chagnon that he intended to consult with Foerster as to whether it might be necessary to return Patient B for additional emergency surgery to optimize his chances of full recovery.

87. Shortly after Dr. Long's conversation with Chagnon, Hofstetter angrily confronted Dr. Long inside the surgical suite and instructed Dr. Long not to return Patient B to the operating room since it would further disrupt NMC's elective surgery schedule.

88. In response, Dr. Long advised Hofstetter that NMC had an "emergency room" sign out front, that emergency surgeries take precedence over elective surgeries, and that elective surgeries would have to be postponed if, after consulting with Foerster, Dr. Long made the professional decision to perform additional emergency surgery on Patient B.

89. Hofstetter is the CEO of NMC and is not a physician; he is therefore totally unqualified to make a medical decision as to whether or not Patient B required further emergency surgery. His prohibition on further emergency surgery for Patient B was motivated by his desire to maximize NMC's profits, with total disregard for Patient B's welfare.

90. On or about September 10, 2002, Dr. Long's Provisional Privileges at NMC expired.

91. On numerous occasions, Dr. Long had asked Hofstetter when his Active Staff privileged would be advanced. Hofstetter repeatedly declined to answer Dr. Long's inquiries, and advised Dr. Long to speak with his assistant, Marilyn Fairbanks ("Fairbanks").

92. On numerous occasions, Dr. Long asked Fairbanks when his Active Staff privileges would be advanced. Fairbanks, like Hofstetter, never answered Dr. Long's inquiries.

93. On or about December 2, 2002, Burfoot, in his capacity as NMC's Chief of Surgery, wrote to Dr. Edward Haak ("Haak"), Chairman of NMC's Credentials Committee, falsely asserting that Dr. Long lacked technical competence as a surgeon. This letter was false, malicious, defamatory, in bad faith, and calculated to wrongfully harm Dr. Long economically, professionally, and in his reputation.

94. By writing directly to Haak, Burfoot acted outside established peer review procedures and not for the purpose of promoting quality health care.

95. At approximately the same time, Hofstetter spoke with Foerster and, without basis, questioned Dr. Long's technical skill and competence as a surgeon.

96. On or about December 3, 2002, Dr. Long received a letter signed by Hofstetter, Burfoot, and others, stating that a recommendation for Active Staff Privileges by Burfoot could not be made. The letter stated that this was due to several reviews of Dr. Long's surgical cases by SSSQA.

97. NMC bylaws required Dr. Long's application for Active Staff Privileges to include a recommendation letter from Burfoot in his capacity as NMC Chief of Surgery.

98. Pending further review of Dr. Long's Active Staff Privileges, NMC extended his Provisional Privileges until January 10, 2003.

99. On or about December 4, 2002, Foerster advised Dr. Long that Hofstetter, citing unspecified complaints about Dr. Long, had decided to deny Dr. Long Active Staff Privileges at NMC. Pursuant to Medical Staff Bylaws and operating procedures, Hofstetter had no authority to deny Dr. Long Active Staff Privileges.

100. During the first half of December 2002, Dr. Long met multiple time with Hofstetter and Burfoot in an effort to resolve the issue of Dr. Long's Active Staff Privileges.

101. At the aforesaid meetings, Hofstetter and Burfoot admitted, *inter alia*, the following:

    a. None of Dr. Long's surgical colleagues had expressed any concern regarding Dr. Long's technical skills or professional competence;

    b. NMC had received no complaints concerning Dr. Long from his patients, families of patients, NMC's Emergency Department personnel, NMC's Medical Surgical personnel, or physicians in the community;

c.  As verified by Burfoot's quarterly reports, any alleged concerns about Dr. Long's interpersonal relations with operating room personnel had long been satisfactorily resolved and there were no complaints from operating room personnel.

102.    At the aforesaid meetings, neither Hofstetter nor Burfoot cited any specifics supporting their conclusion that Dr. Long was not a proficient and skilled surgeon, save for one vague allusion by Burfoot regarding Dr. Long's ability to properly perform arthroscopy. This vague allusion was based at least partly on the false and malicious campaign waged by Archambault against Dr. Long.

103.    Burfoot is not an orthopedic surgeon and is totally unqualified to render an opinion on Dr. Long's skills as an arthroscopist.

104.    At one aforesaid meeting, Hofstetter advised Dr. Long that even if SSSQA were to favorably review Dr. Long's surgical cases, a recommendation from Burfoot for advancement of Dr. Long's Active Staff Privileges might not be forthcoming because of so-called "squishy stuff."

105.    Dr. Long requested clarification as to the meaning of "squishy stuff," but Hofstetter refused to define his own term; he only stated that he was unsure of Dr. Long's surgical results and that Dr. Long "did not fit in" at NMC.

106.    Denial of Active Staff Privileges at NMC would result in Dr. Long suffering grave economic loss and damage to his reputation and would severely impair his ability to obtain either employment as a surgeon or privileges at other healthcare facilities.

107.    At the aforesaid meetings, Hofstetter and Burfoot acknowledged that denial of Dr. Long's Active Staff Privileges by NMC would effectively destroy Dr. Long's career as an orthopedic surgeon.

108.    On or about December 19, 2002, the SSSQA met to review three of Dr. Long's surgeries, including that of Patient A. By that date, Dr. Long had learned of two interscalene nerve blocks, in addition to Patient A's, performed by Roberts which had produced major complications.

109.    At the SSSQA meeting, Dr. Long requested documentation as to the interscalene nerve block complication rates of each NMC anesthesiologist, as part of his professional duty to ensure his patients have such information.

110.    Roberts was NMC's Anesthesia Department representative to the SSSQA and was present at the meeting in that capacity. Since the SSSQA was reviewing, *inter alia*, the interscalene nerve block administered by Roberts to Patient A, Roberts' purported peer review of his own work constituted a blatant conflict of interest, but the SSSQA chairman, Joseph Salomone, M.D. ("Salomone"), still permitted Roberts to peer review his own case.

111.    Dr. Long directly asked Roberts for Roberts' interscalene nerve block complication rate; Roberts was evasive and refused to answer.

112.    Dr. Long presented the SSSQA with his research on complication rates at other healthcare facilities, which demonstrated that Roberts' three known complications seemed to represent a high trend. Dr. Long also reminded the SSSQA that Patient A had suffered a catastrophic injury as a result of Roberts' interscalene nerve block.

113.    Dr. Long repeated his request for disclosure of the complication rates of all NMC anesthesiologists, pointing out to the SSSQA that it was his duty to have such information to protect his patients' well-being and to obtain their valid informed consent.

114.     Dr. Long then left the SSSQA meeting, at which time Roberts became visibly angry and upset by Dr. Long's request.

115.     NMC's SSSQA determined that all of Dr. Long's surgical cases which had been submitted for review met applicable standards of care, and the anesthetic complication rates were never disclosed to Dr. Long.

116.     On or about December 20, 2002, Burfoot and Hofstetter, acting within the scope of their agencies and employments by NMC and/or Triad and/or QHR, intentionally, wrongfully, maliciously, and in bad faith published a false and defamatory letter to, among others, the Credentialing Committee and the Medical Executive Committee ("MEC"), recommending that Dr. Long not be granted Active Staff Privileges since Dr. Long had exhibited "severe behavioral disturbances that have adversely affected patient care."

117.     Burfoot and Hofstetter, acting within the scope of their agencies and employments by NMC and/or Triad and/or QHR, intentionally, wrongfully, maliciously and in bad faith published the aforesaid false and defamatory letter to members of the Credentialing Committee and MEC, and other persons not belonging to those committees.

118.     Burfoot and Hofstetter published the aforesaid false and defamatory letter by sending copies to the aforesaid committee members without any advisory on the copies or envelopes that the letter was to be treated as confidential.

119.     The aforesaid false and defamatory letter was published in bad faith and outside the course of established peer review procedures, in that it was read and reviewed by persons other than the members of the aforesaid committees.

120.     It is believed and averred that Burfoot and Hofstetter, acting within the scope of their agencies and employments by NMC and/or Triad and/or QHR, intentionally, wrongfully, maliciously, and in bad faith published the false and defamatory letter in retaliation for Dr. Long having repeatedly demanded the complication rates of NMC's anesthesiologists and/or for Dr. Long having advised Patient A to bring legal action for medical malpractice and demanding cancellation of Patient A's surgical bill.

121.     It is believed and averred that Burfoot and Hofstetter, acting within the scope of their agencies and employments by NMC and/or Triad and/or QHR, intentionally, wrongfully, maliciously, and in bad faith published the false and defamatory letter for purposes of disparaging Dr. Long, pursuant to the conspiracy to restrain trade and eliminate Dr. Long as a competitor to Archambault.

122.     The aforesaid false and defamatory letter falsely, maliciously, and publicly portrayed Dr. Long as mentally unstable, unfit to practice his profession, and dangerous to patients.

123.     It is believed and averred that Hofstetter and Burfoot published the aforesaid false and defamatory letter in furtherance of a conspiracy to restrain trade by way of eliminating Dr. Long as a competitor of NMC for the provision of MRI services.

124.     It is believed and averred that Hofstetter and Burfoot published the aforesaid false and defamatory letter to force Dr. Long out of the St. Albans, Vermont medical community in order to prevent discovery of the illegal kickback scheme operated by Hofstetter and NMC, to wit, with regard to radiology services.

125.     As intended, Burfoot and Hofstetter's publication of the aforesaid letter wrongfully harmed and damaged Dr. Long's reputation in the St. Albans market and

among his peers, held him up to ridicule, contempt, and disrepute, and damaged Dr. Long professionally, economically, and emotionally as more fully set forth below.

126. On or about December 24, 2002, unaware of the aforesaid false and defamatory letter published by Hofstetter and Burfoot, Dr. Long wrote to Hofstetter and Burfoot to memorialize their December 19, 2002 meeting and to demand a fair hearing, pursuant to Medical Staff Bylaws, for a corrective action to redress, *inter alia*, Hofstetter's unwarranted, malicious, and unauthorized threat to withhold advancement of Dr. Long's Active Staff Privileges.

127. The Medical Staff Bylaws provide for a Fair Hearing Plan, whereby an aggrieved physician is entitled to the convening of a jury of impartial persons drawn from the community and one NMC representative. The jury is to review the grievance and render a binding decision as to whether or not corrective action should be taken to redress the grievance.

128. In his letter, Dr. Long noted that Burfoot had bypassed peer review procedures by writing directly to Haak as chairman of the Credentialing Committee to impugn Dr. Long's fitness to practice medicine.

129. In his letter, Dr. Long reiterated that, because of Hofstetter and Burfoot's wrongful actions, Dr. Long was faced with destruction of his professional career based on unspecified "perceptions" of unidentified individuals outside Dr. Long's peer group and Hofstetter's unspecified "squishy stuff."

130. At no time have Hofstetter, Burfoot, nor any other NMC staff, refuted Dr. Long's aforesaid letter.

131.     On or about December 30, 2002, Hofstetter wrongfully denied Dr. Long's

demand for a fair hearing under the Medical Staff Bylaws.

132.     On or about January 2, 2003, Dr. Long learned of the false and defamatory letter

of December 20, 2002, for the first time. He read the false and defamatory letter, which

had been placed in his personnel file, and demanded a copy, which Hofstetter wrongfully

refused to release.

133.     For the limited purposes of identification and authentication, Dr. Long, in the

presence of witnesses, signed the aforesaid false and defamatory letter and requested its

preservation.

134.     On or about January 6, 2003, Dr. Long wrote to Hofstetter protesting the aforesaid

letter as false, demanding its removal from Dr. Long's personnel file, demanding that

Burfoot be removed from Dr. Long's credentialing process, and demanding that the

Credentials Committee be allowed to make its recommendation to MEC, concerning Dr.

Long's Active Staff Privileges, "based on established fact." If Burfoot was not removed

from Dr. Long's credentialing process and the Credentials Committee was not permitted

to process on the basis of information available from the regular peer review process, Dr.

Long wanted a fair hearing under the Medical Staff Bylaws.

135.     On or about January 7, 2003, Hofstetter wrote to Long, wrongfully denying both

Dr. Long's demand that Burfoot be removed from the credentialing process and Dr.

Long's demand for a fair hearing.

136.     On or about January 7, 2003, Dr. Long was in the operating room immediately

prior to performing a complex emergency surgery when he was abruptly summoned to

Hofstetter's office, whereupon Hofstetter told Dr. Long that Dr. Long could either resign

from NMC or Hofstetter would retain prominent legal counsel to force Dr. Long's resignation and destroy his professional career.

137.     At the aforementioned meeting, Hofstetter falsely claimed that he had a "stack of complaints" against Dr. Long, but was unable to produce a single complaint upon Dr. Long's demand to see the complaints.

138.     Dr. Long refused to resign and returned to the operating room. As a result of Hofstetter's well-timed threat, Dr. Long was upset as he performed the complex emergency surgery and a surgical complication resulted.

139.     It is believed and averred that Hofstetter, acting in the scope of his employments and agencies, threatened Dr. Long as aforesaid to further the goals of the aforesaid conspiracy in restraint of trade, and in retaliation for Dr. Long's having demanded release of the aforesaid anesthesiology complication rates, requesting cancellation of Patient A's surgical bill, having advised Patient A to bring a medical malpractice action, and for the purpose of trying to provoke Dr. Long into making a surgical error which would result in a surgical complication that could then be used as grounds to deny Active Staff Privileges, and otherwise provoke Dr. Long into manifesting "severe behavioral disturbances" that would adversely affect patient care to generate after the fact support for the aforesaid false and defamatory letter.

140.     In late December 2002, Dr. Long met with Haak, Chairman of the Credentialing Committee, to express his concerns as to the wrongful actions of Hofstetter and Burfoot as aforesaid. Subsequently, the Credentialing Committee, without recommendation, referred Dr. Long's credentialing process directly to MEC.

141.    On or about January 20, 2003, Dr. Long met with MEC as part of his credentialing process, at which Dr. Long stated, *inter alia*, the following:

    a.   That it had always been Dr. Long's understanding that, in order to properly promote patient safety and welfare, the SSSQA peer review process had to be a forum for open and honest exchanges among physicians concerning patient healthcare without fear of retaliation for the views expressed;

    b.   That Dr. Long had concerns about patient safety as it related to the anesthesia complication rate at NMC, and about the aforesaid wrongful, malicious, retaliatory and bad faith actions taken against him by Hofstetter and Burfoot, including the aforesaid false and defamatory letter of December 20, 2002;

    c.   That the aforesaid false and defamatory letter was an obvious retaliation for Dr. Long having exposed Roberts' high complication rate and having pressed for release of the complication rates of all other NMC anesthesiologists;

    d.   That Hofstetter and Burfoot were retaliating against Dr. Long because he had pressed for release of NMC's anesthesia complication rate, requested cancellation of Patient A's surgical bill, and had advised Patient A to bring a medical malpractice action;

    e.   That Hofstetter had abruptly summoned Dr. Long from the operating room to threaten Dr. Long and force him to resign from NMC; and

    f.   That Dr. Long had returned to the operating room upset by Hofstetter's threats and how a surgical complication had resulted therefrom. Dr. Long presented to MEC a formula, documented in the medical literature, demonstrating that surgical complications vary in direct proportion to the level of adversity (defined as any

event or circumstance that distracts the surgeon, including emotional distress,

anger, inadequate staff, and improper instrumentation) encountered by the

surgeon.

142.　　Hofstetter was present at the MEC meeting. Dr. Long addressed him, asking if

Hofstetter thought it was appropriate to threaten a surgeon immediately prior to surgery,

and warning Hofstetter that his behavior posed a danger to patient safety.

143.　　Dr. Long then left the MEC meeting.

144.　　The MEC removed Hofstetter and Burfoot from any further involvement in Dr.

Long's credentialing process. Following this action, Hofstetter became visibly angry,

upset, and enraged on numerous occasions when Dr. Long's name was mentioned in his

presence.

145.　　On or about February 10, 2003, Dr. Long met with MEC, at which time he

presented proof of his surgical skills and advised that he would not resign from MEC and

invited MEC to have his surgical cases reviewed by outside experts in orthopedic

surgery.

146.　　As part of the credentialing process, the SSSQA reviewed Dr. Long's cases and

determined that those cases met applicable standards of medical care.

147.　　On or about February 25, 2003, NMC granted Dr. Long full, unrestricted Active

Staff Privileges, based on the unanimous vote of NMC's MEC, minus Burfoot and

Hofstetter; aforesaid privileges would be effective for two years pursuant to Medical

Staff Bylaws.

148.　　Around the time Dr. Long received full, unrestricted Active Staff Privileges,

Adamsons, a partner of Burfoot and Roberts, initiated a series of professionally

substandard and antagonistic incidents which were directed against Dr. Long and Dr. Long's patients.

149.     Dr. Long complained to Dr. Leonard Tremblay ("Tremblay"), MEC Chairman, about Adamsons' unprofessional actions. Dr. Long told Tremblay that the aforesaid incidents were attempts to provoke an intemperate reaction by Dr. Long in order to retrospectively justify the aforesaid false and defamatory letter, which falsely and maliciously alleged that Dr. Long had exhibited "severe behavioral disturbances that adversely affected patient care," and to cause surgical complications, to make Dr. Long's practice of medicine at NMC untenable, all in violation of the Medical Staff Bylaws and in illegal restraint of trade.

150.     On or about April 8, 2003, Dr. Long hand delivered a letter setting forth the aforesaid incidents to SSSQA Chairman Salomone and, at the same time, discussed the contents of the letter with Salomone.

151.     In his letter to Salomone, Dr. Long detailed various incidents of professionally substandard and antagonistic conduct by Adamsons including, *inter alia*, the following:

    a.    On or about January 22, 2003, after being paged eight times without response, Adamsons arrived two hours late at the operating room to anesthetize one of Dr. Long's patients, an eight-year-old child with a severe limb-threatening elbow fracture, despite the fact that the patient required emergency surgery. Dr. Long cited Adamsons' delay in such an emergency situation as "unacceptably dangerous."

b. On or about February 22, 2003, in a loud and angry manner, Adamsons verbally attacked and abused Dr. Long in public as Dr. Long was treating three severely injured patients simultaneously.

c. On or about February 25, 2003, Adamsons performed a nerve block on one of Dr. Long's surgical patients in contravention of Dr. Long's directions. The nerve block needlessly and dangerously complicated Dr. Long's ability to assess the patient's post-operative neurological condition and necessitated that Dr. Long use an alternative surgical method less medically desirable than the one precluded by the nerve block.

d. On or about March 21, 2003, Adamsons negligently contaminated the sterile surgical field immediately prior to Dr. Long starting surgery, and then re-contaminated the surgical field after it had been re-established after Adamsons' first contamination.

152. In his letter to Salomone, Dr. Long further:

a. Advised that Adamsons' and others' substandard, unprofessional, and antagonistic conduct as aforesaid endangered patient welfare and constituted calculated attempts to anger and provoke Dr. Long to exhibit intemperate reactions which could then be characterized as "severe behavioral disturbances" in a blatant, after the fact effort to substantiate the false and malicious contents of Burfoot's December 20, 2002 letter, and to cause complications that could later be used against Dr. Long when consideration was given to potential advancement of his Active Staff Privileges;

     b. Demanded that the situation be promptly corrected in order to assure protection for Dr. Long and his patients;

     c. Demanded that the SSSQA be convened to address the aforesaid incidents and the danger posed to patients, in light of Burfoot's December 20, 2002 letter.

153.    Subsequently, Dr. Long made numerous written demands that the aforesaid false and defamatory letter of December 20, 2002 be removed from his personnel file and that affirmative steps be taken to end the aforesaid dangers to patient safety.

154.    Dr. Long further demanded that NMC have a representative of the Joint Commission for the Accreditation of Health Organizations ("JCAHO") review the circumstances under which the aforesaid false and defamatory letter had been published and to monitor the fair hearing and SSSQA process that he had requested.

155.    NMC, acting through the MEC and at Hofstetter's direction, declined to remove the false and defamatory letter from Dr. Long's personnel file.

156.    No disciplinary action was taken against Adamsons and/or others to deter or discourage future actions which posed a threat to the welfare and safety of Dr. Long's patients.

157.    Consequently, Dr. Long repeatedly requested a fair hearing pursuant to the Medical Staff Bylaws to remove the aforesaid false and defamatory letter from his personnel file and, as a matter of patient safety, to end the ongoing efforts to antagonize and provoke Dr. Long into exhibiting intemperate reactions which could then be characterized as "severe behavioral disturbances adversely affecting patient care" and to cause surgical complications to Dr. Long's patients.

158.    Despite his repeated demands for a fair hearing, Dr. Long was not granted one, and no steps were taken to deter or discourage the aforesaid provocative actions by Adamsons and others which posed a danger to patient safety and welfare.

159.    In his April 8, 2003 letter to, and discussion with, Salomone, Dr. Long demanded that the case of Patient D be referred to NMC's SSSQA for peer review.

160.    Adamsons, a partner of Burfoot, Roberts, and Mason, had administered a right-sided interscalene nerve block to Patient D by inserting a needle into her neck at the cervical spine level of C6-7.

161.    Patient D had reported excruciating pain radiating down her right side the moment Adamsons inserted the needle into her neck as he attempted the interscalene nerve block.

162.    In the post-operative period following the interscalene nerve block administered by Adamsons, Patient D reported difficulty using her right hand. Patient D had developed an acute focal neurological deficit involving the right upper extremity, which was determined by neurological consultation to be a central nervous system lesion.

163.    An MRI of Patient D's cervical spine demonstrated a linear transverse focus consistent with a needle track at the same cervical level where Adamsons had inserted the needle. The aforesaid needle track extended into Patient D's spinal cord, resulting in a syrinx (fluid-filled cavity of the spinal cord) consistent with a hemorrhage in the spinal cord substance.

164.    Prior to referring Patient D's case to the SSSQA, Dr. Long had reviewed the aforesaid findings and MRI with Adamsons and asked Adamsons whether he believed that Patient D's complication could have been caused by the interscalene nerve block that

Adamsons performed. Adamsons refused to answer Dr. Long's questions concerning the possible cause of Patient D's complication.

165.     In his April 8, 2003 letter to, and discussion with, Salomone, Dr. Long explained, regarding Patient D:

 a. That Patient D had undergone an interscalene nerve block administered by Adamsons and had developed an acute focal neurological deficit involving the upper right extremity which was determined by neurological consultation to be a central nervous system lesion;

 b. That Patient D reported excruciating nerve pain radiating down her right side at the moment Adamsons inserted the needle into her neck as he attempted the interscalene nerve block;

 c. That an MRI of Patient D's cervical spine demonstrated a "linear transverse focus" consistent with a needle track at the same cervical level where Adamsons had inserted the needle, and that aforesaid needle track extended into Patient D's spinal cord, resulting in a syrinx consistent with a spinal cord substance hemorrhage.

166.     Dr. Long had previously provided the SSSQA with medical literature on interscalene nerve blocks using a review article with the rate of anesthetic complications arising from them, and a review of several patients who sustained acute traumatic needle injury to the cervical spine with resultant focal neurological deficits and MRI findings similar to those of Patient D.

167.     Salomone advised Dr. Long that Dr. Long would be invited to present the entire contents of his April 8, 2003 letter, including Patient D's case, to the SSSQA, but Dr.

Long heard nothing more about the SSSQA disposition or any other Medical Staff committee of the matters set forth in his letter, and, despite his previous requests for such information, Dr. Long has never provided NMC's interscalene nerve block complication rate.

168.    Unknown to Dr. Long, Salomone convened the SSSQA with the participation of Roberts (the partner of Adamsons, Burfoot, and Mason).

169.    Under Salomone's guidance, the SSSQA permitted Adamsons to participate in the review of the matters set forth in Dr. Long's letter, and exonerated Adamsons regarding his unprofessional behavior, including his contamination of surgical cases and failure to respond to aforesaid emergency pages.

170.    Under Salomone's guidance, the SSSQA did not permit Dr. Long to appear or participate in the review, contrary to Salomone's previous assurances to Dr. Long.

171.    The SSSQA, under Salomone's guidance and with Roberts' participation, failed to conduct any legitimate investigation of Patient D's complication. Contrary to the evidence and the supplied medical literature, and despite the fact that Patient D had no preexisting neurological problems with the upper right extremity, concluded that Patient D's complication was related to preexisting cervical pathology.

172.    As set forth in the aforesaid medical literature provided by Dr. Long with his April 8, 2003 letter to Salomone, Patient D's MRI was consistent with MRI findings of patients who had suffered needle injury during improper performance of an interscalene nerve block.

173.     Aware that NMC would have Patient D's original digital MRI file, Dr. Long had

retained custody of the original printed MRI, which demonstrated the needle track and

hemorrhage in Patient D's spinal cord, in his private office.

174.     On or about November 3, 2003, without Dr. Long's permission or knowledge,

NMC employee Sheila Gregoire ("Gregoire") wrongfully and illegally entered Dr.

Long's private office and removed Patient D's original printed MRI which demonstrated

the needle track and hemorrhage in Patient D's spinal cord.

175.     On or about November 10, 2003, Dr. Long became aware that Gregoire had

illegally and without permission entered his office and removed Patient D's original

printed MRI. The same day, a member of Dr. Long's office staff contacted Gregoire and

requested the return of Patient D's MRI.

176.     Gregoire did not return Patient D's original MRI which demonstrated the needle

track and hemorrhage in Patient D's spinal cord. Instead, she provided an altered copy in

which, *inter alia*, the needle track had been deleted.

177.     In early 2002, Dr. Long had been granted temporary privileges at Littleton

Regional Medical Center ("LRMC") in New Hampshire to assist a colleague with a series

of complex surgeries. At that time, NMC had provided a letter of good standing attesting

to LRMC that Dr. Long, *inter alia*, suffered no physical or mental defects and was in

good standing at NMC.

178.     In Summer 2003, Dr. Long was asked to return to LRMC to perform additional

complex surgeries.

179.     Hofstetter arbitrarily, capriciously, and without justification, refused to send

LRMC a letter of good standing as previously provided. Dr. Long met with Hofstetter to

discuss Hofstetter's refusal to provide the letter of good standing, at which time

Hofstetter again insisted that Dr. Long resign from NMC and stated that Dr. Long did not

fit in at NMC, despite the fact that Dr. Long had been granted full, unrestricted Active

Staff privileges.

180.    When Dr. Long refused to resign, Hofstetter angrily asked Dr. Long, "Aren't you

afraid of me?" Dr. Long replied that he was not afraid of Hofstetter, would not resign,

and stated that Hofstetter was bound by NMC's Bylaws, under which Dr. Long and his

patients had rights. Hofstetter angrily stated that he was not subject to the Bylaws.

181.    In early July 2003, NMC required Dr. Long to reapply for Active Staff Privileges

even though those privileges had been granted in February 2003 for a period of two

years. Although Dr. Long protested, he was nevertheless required to submit to the re-

credentialing process even though he had approximately eighteen months before his

Active Staff Privileges were set to expire.

182.    In July 2003, at Foerster's initiation, a meeting was convened at NMC to address

the aforesaid events, including, *inter alia*, Burfoot's defamatory letter and issues

regarding safety and welfare of Dr. Long's patients. The meeting was attended by Dr.

Long, Dr. Long's legal counsel, Hofstetter, Salomone, legal counsel for MEC, and others.

183.    At aforesaid meeting, Dr. Long stated that, in derogation of patient safety,

Hofstetter and others acting at his direction were attempting to provoke Dr. Long into

exhibiting intemperate reactions which could then be characterized as "severe behavioral

disturbances" in order to justify and substantiate Burfoot's false and defamatory letter

after the fact.

184.     At aforesaid meeting, Dr. Long demanded that the aforesaid false and defamatory letter be removed from his personnel file and that prompt action be taken to deter or discourage further provocative actions which posed a danger to his patient's safety and welfare.

185.     At aforesaid meeting, legal counsel to MEC recommended removal of the false and defamatory letter from Dr. Long's personnel file. However, NMC illegally and in bad faith continues to retain the aforesaid false and defamatory letter in Dr. Long's personnel file at Hofstetter's direction and in violation in its Bylaws.

186.     While Dr. Long's re-credentialing process was underway, Hofstetter, acting in the scope of his agencies and employments by Triad and/or QHR and NMC, arbitrarily, wrongfully, in bad faith, in furtherance of the goals of the aforesaid conspiracy in restraint of trade and for retaliatory purposes directed that Dr. Long be referred to SSSQA for review of three of his surgical cases.

187.     At the time, Hofstetter knew or reasonably should have known the following:

   a.   Referred Case No. 1: This case did not involve one of Dr. Long's patients;

   b.   Referred Case No. 2: The surgery in this case was not performed by Dr. Long; Dr. Long had seen the patient only in follow-up;

   c.   Referred Case No. 3: This case involved a mother accused of twice breaking her infant's arm; she attempted to shift blame for re-breaking her child's arm to Dr. Long by falsely claiming that Dr. Long had removed the cast from the break too early. Hofstetter knew that the second break had previously been determined by law enforcement to be the result of child abuse, and not an error by Dr. Long; and therefore,

d.  No basis existed for referring Dr. Long or the aforesaid cases to SSSQA.

188.     On or about September 16, 2003, Dr. Long's counsel wrote to NMC's counsel citing concern for the safety of Dr. Long's patients, protesting the unwarranted referral of Dr. Long to SSSQA, and requesting NMC's counsel to share this protest with NMC's Board of Governors and "put an end to this foolishness."

189.     Despite Hofstetter's wrongful efforts, Dr. Long's re-application for Active Staff Privileges was unanimously approved by MEC and the Board of Governors. On or about October 23, 2003, Dr. Long was once again granted full, unrestricted Active Staff Privileges.

190.     On or about September 19, 2003, at NMC, Archambault began a total surgical hip replacement on Patient E, a surgery which three qualified medical experts had recommended against as unnecessary and not indicated by Patient E's clinical diagnosis. Archambault knew or reasonably should have known that the surgery was unwarranted.

191.     In his preoperative history and physical report, Archambault wrongfully omitted any reference to the aforesaid expert opinions recommending against the surgery.

192.     During the surgery, Archambault negligently, incompetently, and severely fractures Patient E's femur, and negligently and incompetently twice cemented into place an improperly positioned prosthesis.

193.     Archambault then summoned Dr. Long to the operating room, where he told Dr. Long that he could not figure out how to position the prosthesis and asked Dr. Long to do it for him. Dr. Long took over the surgery and, to the extent possible, corrected Archambault's negligent and incompetent errors.

194.    After Patient E's surgery, Archambault made false statements in the operative

report to give the false and misleading impression that Patient E had suffered metallosis,

a condition which would have justified the surgery. Archambault knew or reasonably

should have known that there was no evidence of metallosis and the surgery was totally

unnecessary. Further, Archambault wrongfully omitted from the operative report any

reference to Dr. Long's participation in the surgery.

195.    Archambault knowingly, falsely, maliciously, in bad faith and in furtherance of

the goals of the aforesaid conspiracy in restraint of trade, advised MEC that none of the

other orthopedic surgeons would assist Dr. Long in surgery.

196.    In approximately November 2003, Dr. Long observed Archambault in possession

in x-rays pertaining to some of Dr. Long's patients. At that time, Archambault advised

that he was performing a peer review of Dr. Long's surgeries on those patients, which

would not have been as part of any established peer review process pursuant to Medical

Staff Bylaws.

197.    In a similar effort to cause Dr. Long professional harm and eliminate him as a

competitor, Archambault knowingly, falsely, and maliciously advised the mother of one

of Dr. Long's minor patients that if she allowed Dr. Long to operate on her son, the result

would be disastrous. Archambault also knowingly, falsely, and maliciously told one of

Dr. Long's surgical patients, Patient F, that Dr. Long had botched Patient F's surgery and

caused him to develop arthritis.

198.    Archambault subsequently performed surgery on Patient F, and subsequent to the

surgery, falsely, wrongfully, and maliciously executed an operative report pertaining to

Patient F's surgery in which he falsely reported that Dr. Long had improperly placed a

screw in Patient F's ankle joint. Archambault knew or reasonably should have known that Dr. Long never placed a screw in Patient F's ankle joint.

199.     Archambault's actions as aforesaid were undertaken to publicly, falsely, and maliciously harm Dr. Long's personal and professional reputation and to destroy his surgical practice.

200.     For the reasons set forth below, it is believed and averred that Archambault's actions against Dr. Long as aforesaid were undertaken in concert with the other defendants in this suit to, *inter alia*, advance their conspiracy in restraint of trade.

201.     On or about October 21, 2003, as Dr. Long was performing a critical aspect of a complex surgery in the vicinity of the patient's axillary nerve, he was interrupted by Chagnon who insisted that Hofstetter had to speak with Dr. Long urgently. Dr. Long refused to interrupt the surgery for that purpose.

202.     After completing the surgery, Dr. Long contacted Hofstetter who falsely stated that Dr. Long had not paid his hospital pager bill and threatened to have Dr. Long's pager cut off, a serious action given that Dr. Long had to be on call for medical emergencies and his patients. Hofstetter knew or reasonably should have known that Dr. Long's pager bill had been paid through 2005.

203.     It is believed and averred that, by having Chagnon interrupt Dr. Long at a critical point in a complex surgery over a false and insignificant claim that Dr. Long had not paid his pager bill, Hofstetter was attempting to harass and provoke Dr. Long into exhibiting an intemperate response which could then be characterized as a severe behavioral disturbance, create adversity that would increase the likelihood of Dr. Long committing a

surgical error that would result in a complication and inducing Dr. Long to resign from NMC.

204.     By letter dated December 11, 2003, Dr. Long's counsel, again citing concern for the safety and welfare of Dr. Long's patients, demanded an immediate fair hearing to address, *inter alia*, the aforesaid disruptions created by Hofstetter and Burfoot. Dr. Long's legal counsel requested the involvement of JCAHO and QHR, in the interest of patient safety and welfare.

205.     On or about November 12, 2003, unknown to Dr. Long at that time and with no prior warning, discussion, or justification, Hofstetter, NMC employee Mark Sutton ("Sutton") and Gregoire wrongfully, maliciously, illegally, and in violation of the Medical Staff Bylaws, caused a large printed notice ("the Notice") to be publicly posted in NMC's Diagnostic Imaging Library which stated the following: EFFECTIVE IMMEDIATELY | DR. LONG MAY NOT SIGN OUT ANY JACKETS FROM THE FILM LIBRARY. IF YOU HAVE ANY PROBLEMS WITH HIM ON THIS MATTER PLEASE REFER IT TO MARK AND IF HE IS NOT AVAILABLE REFER IT TO PETER HOFSETTER (sic).

206.     On or about December 25, 2003, when he attempted to remove x-rays for the purpose of obtaining a second opinion regarding possible emergency surgery on a ninety-five (95) year old patient who had suffered a fractured him, Dr. Long learned of the Notice for the first time.

207.     At that time technician Bonnie Day ("Day") advised Dr. Long that she was prohibited from signing out the x-rays and brought his attention to the Notice. Without

complaint or argument, Dr. Long copied the Notice and notified Tremblay in his capacity as NMC's MEC Chairman.

208.    The Notice, prominently displayed in NMC's Diagnostic Imaging Library, in effect directed that Dr. Long could not remove diagnostic images such as x-rays, MRI images and CT scans from the library, constituting a serious impairment of his full and unrestricted Active Staff Privileges and violating NMC Bylaws. It also constituted a serious impairment on Dr. Long's ability to render proper patient care, thereby posing a threat to the safety and welfare of his patients.

209.    It is believed and averred that the Notice was calculated by Sutton, Gregoire, and Hofstetter to embarrass and defame Dr. Long, subject him to ridicule, raise unfounded questions regarding his fitness to practice his profession, severely impede his ability to efficiently practice his profession, provoke him into exhibiting an intemperate reaction which would then be characterized as severe behavioral disturbance, create adversity that would increase the likelihood of him committing surgical error, induce him to resign from NMC, and generate a written record of an adverse event.

210.    On or about December 26, 2003, at Hofstetter's direction, Gregoire and Sutton aggressively interrogated Day concerning Dr. Long's reaction when he became aware of the Notice.

211.    Despite Day's insistence that Dr. Long had reacted calmly, Gregoire and Sutton repeatedly urged her to falsely report that Dr. Long had reacted by using profanity and behaving in an intemperate, angry, and inappropriate matter; they further urged Day to state that Dr. Long had been aware of the Notice at least three weeks prior to December 25, 2003.

212.    Day refused to falsely report the aforesaid and continued to state the truth: that Dr. Long had been calm and polite when he became aware of the Notice and that, to her knowledge, he had not seen the Notice before December 25, 2003.

213.    Subsequent to this initial interrogation, Gregoire and Sutton twice more interrogated Day, during which they insisted that Day sign a statement falsely alleging that Dr. Long had seen the Notice at least three weeks prior to December 25, 2003 and had reacted to the Notice by using profanity and behaving in an intemperate, angry, and inappropriate manner.

214.    Each time she was interrogated and pressured, Day refused to be intimidated and repeated that Dr. Long had remained calm and polite and, to her knowledge, had not seen the Notice before December 25, 2003.

215.    On or about December 26, 2003 and subsequently, Dr. Long's counsel repeatedly demanded in telephone conferences with NMC's counsel that the Notice be removed and that a fair hearing be immediately convened.

216.    By letter dated December 29, 2003, Dr. Long's legal counsel, again citing concerns for the safety and welfare of Dr. Long's patients, amended the aforesaid December 11, 2003 demand for an immediate fair hearing to address the arbitrary reduction of Dr. Long's privileges at NMC including, *inter alia*, the Notice.

217.    Dr. Long's counsel demanded that NMC immediately grant Dr. Long a fair hearing to address the aforesaid wrongful, vindictive, and disruptive actions by defendants in this suit and demanded that the Notice be removed, that Dr. Long be permitted ready access to diagnostic imaging materials, and that JCAHO be brought to NMC to review all of the aforesaid actions against Dr. Long.

218.     NMC neither granted Dr. Long's many demands for an immediate fair hearing nor removed the Notice. This constituted a reduction in Dr. Long's privileges and adversely affected patient safety and welfare.

219.     By letter dated December 31, 2003, Dr. Long's counsel renewed the demands for an immediate fair hearing and immediate removal of the Notice.

220.     On or about December 31, 2003, in a letter marked confidential and hand delivered to Dr. Long by Hofstetter's personal assistant, Gregoire falsely accused Dr. Long of signing out seven x-ray files and holding them for an inordinate period of time.

221.     Gregoire knew or reasonably should have known that her accusation was false, in that five of the subject x-ray files had never been signed out by Dr. Long, and the other two had been returned to the library by Dr. Long within the customary timeframe.

222.     Gregoire's letter was an attempt instigated by Sutton, Gregoire, and Hofstetter to meretriciously justify their wrongful, unwarranted, and unjustified posting of the humiliating and defamatory Notice, to harass, embarrass, humiliate, anger, antagonize, and provoke Dr. Long and to create a dated written record of an event that would cause adversity to a surgeon as aforesaid.

223.     On or about December 31, 2003, the Notice was taken down.

224.     On or about January 9, 2004, Dr. Long performed a complex emergency surgery on a fractured shoulder. Following the aforesaid surgery, Dr. Long requested that post-operative x-rays of the shoulder be taken in the recovery room.

225.     At that time, Dr. Long was advised of a new reduction in his privileges: He would not be permitted to have the post-operative x-rays without signing a special form, a restriction unique to Dr. Long which constituted impairments of his full and unrestricted

Active Staff Privileges and of his ability to render proper patient care, and a violation of Medical Staff Bylaws.

226.     The aforesaid restriction was calculated by Sutton, Gregoire, and Hofstetter to cause a disruption between Dr. Long and NMC's Diagnostic Imaging Department staff that could later be blamed on Dr. Long, impede his ability to practice his profession efficiently, provoke him into exhibiting an intemperate reaction which could then be characterized as a severe behavioral disturbance, create adversity that would increase the likelihood of Dr. Long committing surgical errors, induce Dr. Long to resign from NMC, and generate a written record of an adverse event.

227.     On or about December 9, 2003, Dr. Long performed open shoulder surgery on Patient G and arthroscopic surgery on Patient H.

228.     On or about December 23, 2003, Dr. Long performed arthroscopic shoulder surgery on Patient I and Patient J.

229.     In late December 2003 and early January 2004, Dr. Long became aware that Patient G, Patient H, and Patient I had developed life- and limb-threatening post-surgical infections.

230.     Patient G and Patient H's surgeries had become infected with the deadly bacterium *Staphylococcus aureus.*

231.     Patient I's surgery had become infected with the deadly water-borne bacteria *Serratia marcenscens* and *Pseudomonas aeruginosa.*

232.     Dr. Long is a fellowship-trained shoulder surgeon whose professional reputation is based in large part on his ability to safely perform shoulder surgery. He had never before had a shoulder arthroscopic surgery result in an infection and believed such a

complication to be exceedingly rare. Prior to the aforesaid infections, Dr. Long's post-surgical infection rate for shoulder surgeries was zero percent.

233.     Dr. Long reviewed the medical literature and consulted with an infectious disease expert to confirm that *Serratia* and *Pseudomonas* are water-borne organisms. Accordingly, Dr. Long was able to determine that Patient I's infection was caused by water-borne organisms. Infections by both *Serratia* and *Pseudomonas* have never been described in the medical literature as a complication of shoulder arthroscopy.

234.     Unknown to Dr. Long, in the months leading up to aforesaid surgeries which resulted in infections, NMC had purchased and possessed the deadly bacteria *Staphylococcus aereus* and *Pseudomonas aeruginosa*.

235.     Dr. Long advised the staff at NMC, including Salomone and Duncan, that Patient I's infection was caused by water-borne organisms.

236.     During 2002, NMC had experienced an outbreak of infections affecting orthopedic surgery patients other than those of Dr. Long. In response, NMC had consulted an outside sterility and infectious disease expert.

237.     Given the life- and limb-threatening nature of his patients' infections, Dr. Long notified NMC and Salomone of the infections and demanded a full root cause analysis pursuant to the standards promulgated by the JCAHO including the immediate participation of the same outside sterility and infectious disease expert who NMC had previously engaged.

238.     Dr. Long demanded that all materials used in surgery at NMC, including the irrigation solutions, be tested for contamination and that the infected cases immediately be referred for SSSQA review.

239.     On or about January 5, 2004, NMC wrongfully, maliciously, illegally, and in violation of Medical Staff Bylaws, denied Dr. Long's repeated demands for a fair hearing.

240.     By letters dated January 6, 2004 and January 24, 2004, Dr. Long's counsel, citing previous and additional illegal reductions of Dr. Long's privileges, repeatedly renewed the demand for a fair hearing, citing concerns for patient safety and welfare and demanding that JCAHO and QHR be notified of the aforesaid events. Aforesaid letters also demonstrated the blatant falsity of Gregoire's accusation pertaining to the allegedly missing x-ray files.

241.     By letter to Salomone in his capacity as SSSQA Chairman, dated January 12, 2004, and citing concern for patient safety and welfare, Dr. Long demanded an investigation of, *inter alia*, Hofstetter's actions against Dr. Long as aforesaid, the aforesaid Notice, Gregoire's false accusations concerning missing x-ray files and the life- and limb-threatening infections as aforesaid. Dr. Long further demonstrated, *inter alia*, the blatant falsity of Gregoire's accusation concerning the missing x-ray files.

242.     In support of the letter, Dr. Long also provided extensive documentary proof of its contents as well as a copy of his April 8, 2003 letter in which he demanded, *inter alia*, the removal of Burfoot's false and defamatory letter from his personnel file.

243.     On or about January 22, 2004, Salomone convened an SSSQA meeting and acknowledged receipt of Dr. Long's January 12, 2004 letter with supporting documents.

244.     Dr. Long's letter and documents pertained, in part, to life-threatening infections which had occurred at NMC, and included Dr. Long's demand that SSSQA immediately investigate aforesaid infections. Despite the ongoing risk to patient safety and welfare

posed by the infections, Salomone did not distribute Dr. Long's letter and supporting documentation to SSSQA, citing lack of time.

245.     Under Salomone's guidance, SSSQA did not even consider—much less investigate—the life- and limb-threatening infections or any other concern raised by Dr. Long in his letter and supporting documents.

246.     Instead of investigating these matters, on or about January 26, 2004, a newly constituted MEC chaired by Duncan and attended by Hofstetter and Salomone met to consider Dr. Long's letter and supporting documents. At that meeting, under Duncan's guidance, MEC:

   a.   Acknowledged receipt of the documents pertaining to the reduction of Dr. Long's privileges and the life- and limb-threatening infections occurring in his patients;

   b.   Acknowledged Dr. Long's repeated demands for a fair hearing;

   c.   Expressed concern that Dr. Long had contacted JCAHO and that JCAHO would conduct an unannounced inspection of NMC; and

   d.   Acknowledged the defamatory letter by Burfoot and NMC's possible legal liability for this letter.

247.     Instead of investigating the aforesaid matters raised by Dr. Long or granting him a fair hearing, as was his right, MEC, without foundation and in bad faith queried whether they could compel Dr. Long to undergo a psychiatric evaluation.

248.     NMC, disregarding patient safety and welfare, refused to consult outside experts or test for contamination or conduct any legitimate investigation of the life- and limb-threatening infections or the documented and wrongful reductions in Dr. Long's privileges despite the fact that they represented a threat to patient safety and welfare.

249.     At approximately the same time, at a medical conference in Florida, Dr. Long

discussed the case histories of the infected surgeries and sought the advice of various

conference attendees.

250.     The aforesaid conference attendees recommended, *inter alia*, that Dr. Long have

the irrigation solution used in surgeries at NMC sterility-tested, and that he should look

closely for signs of tampering or sabotage of that solution.

251.     Upon returning to NMC from Florida, Dr. Long reiterated to the NMC staff,

including Chagnon, Salomone, and NMC employee Richard Lamb ("Lamb"), an

infection control nurse, that Patient I's infection had been caused by a water-borne

organism.

252.     Dr. Long demanded that NMC test the surgical irrigating solutions for

contamination; that outside sterility experts be brought in to investigate the infections;

and that NMC perform a root cause analysis pursuant to the standards promulgated by

JCAHO.

253.     In disregard for patient safety and welfare, NMC refused to consult outside

experts, test for contamination, or conduct a legitimate investigation into how the

infections had occurred.

254.     Upon returning from the Florida medical conference, Dr. Long successfully

implemented temporary steps to prevent infection in the remaining surgeries that he

would perform at NMC; after implementing these steps, Dr. Long's surgical infection

rate immediately returned to zero. The aforesaid steps included:

    a.   Selecting disposable items to be used in a surgery immediately before the surgery

        began;

b.  Sterilizing surgical instruments immediately before the surgery began instead of
days in advance; and

c.  Changing the irrigation solution from that provided in advance to a different
solution.

255.    Dr. Long continued to demand a fair hearing to refuse the aforesaid false and
defamatory letter by Burfoot, to have that letter removed from his personnel file, and to
address the many violations of the Medical Staff Bylaws which constituted reductions in
Dr. Long's Active Staff Privileges and a danger to patient safety and welfare.

256.    On or about February 4, 2004, Dr. Long attended a meeting with the MEC, at
which the following occurred:

a.  Duncan proposed a sixty day "cooling off" period during which he would serve as
liaison between Dr. Long and Hofstetter;

b.  Duncan and Salomone assured Dr. Long he would be permitted to safely practice
surgery without interference or harassment by Hofstetter or others;

c.  Dr. Long offered to meet with Hofstetter to resolve any outstanding issues or
differences and was advised that Hofstetter would never accept Dr. Long's offer
to meet and discuss the matter;

d.  Dr. Long demanded to know what steps were being taken to investigate the life-
threatening surgical infections, and was told that whether to conduct such an
investigation was under review;

e.  Dr. Long demanded to see the aforesaid false and defamatory letter. Duncan
produced a copy of the letter, which had been altered to appear less defamatory,
e.g., *inter alia*, "severe behavioral disturbances that have adversely affected

patient care" had been changed to "severe behavioral problems in the operating room";

    f.   Dr. Long noted that his counter-signature as aforesaid was missing from the letter. He advised the attendees that the letter before them was not the aforesaid false and defamatory letter originally published by Hofstetter and Burfoot.

    g.   Dr. Long demanded to see the letter that he had signed, which was refused by Duncan.

    h.   Dr. Long's demand for a fair hearing was also refused, and Duncan advised, instead, that the aforesaid "cooling off" period would prevail.

257.     On or about February 6, 2004, as Dr. Long prepared to perform arthroscopic shoulder surgery, mindful of the advice he had received at the Florida medical conference, and of the fact that no investigation had been undertaken of the aforesaid life-threatening infections, Dr. Long instructed the circulating nurse to obtain a sample of the irrigation solution provided by NMC for this surgery.

258.     As was the case on December 23, 2003 (the date of the surgical infections caused by water-borne bacteria), Dr. Long was the only surgeon utilizing lactated ringers solution that day.

259.     Instead of using the lactated ringers solution from which he had asked the circulating nurse to draw a sample, Dr. Long instructed the circulating nurse to obtain and use a new solution, after which Dr. Long safely and successfully completed the surgery.

260.     Dr. Long submitted the sample to Fletcher Allen Health Care ("FAHC") for testing.

261.    On or about February 8, 2004, FAHC advised Dr. Long that testing conclusively established that the sample of irrigation solution was heavily contaminated with coagulase positive *Staphylococcus aereus*, a deadly infectious agent.

262.    On or about February 9, 2004, Dr. Long's legal counsel reported the aforesaid surgical infections and the testing results to government authorities.

263.    Subsequent testing of NMC's irrigation solutions revealed that the contamination of the solution provided by NMC for Dr. Long's surgery on February 6, 2004 had not occurred at the manufacturing facility, and that *Staphylococcus aereus* is neither a water-borne organism nor a typical accidental contaminant of surgical solutions.

264.    Had Dr. Long used the lactated ringers solution originally provided by NMC on February 6, 2004, his patient would have suffered a life-threatening infection. The aforesaid protective measures taken by Dr. Long, including changing the irrigation solution just prior to the surgery, prevented infection from occurring.

265.    By letter from Hofstetter to Duncan dated March 8, 2004, unknown to Dr. Long, Hofstetter wrongfully and without justification requested that Duncan consider initiating a corrective action against Dr. Long pursuant to Medical Staff Bylaws, falsely alleging disruptions of NMC's surgical and radiology departments by Dr. Long and citing the fact that NMC was under investigation by the Vermont Attorney General's Office. Hofstetter knew or reasonably should have known that his referral of Dr. Long for corrective action was without justification, in bad faith, false, and malicious.

266.    Hofstetter attached to aforesaid letter a false and malicious report by Chagnon that the infected surgeries had been performed after Dr. Long had become aware of the aforesaid Notice in the Diagnostic Imaging Library on December 25, 2003. Hofstetter

knew or reasonably should have known that the infected surgeries were performed before Dr. Long became aware of the Notice.

267.     Hofstetter's referral of Dr. Long for corrective action was made to further the aforesaid conspiracy in restraint of trade, and to retaliate against Dr. Long for his having demanded release of the aforesaid anesthesiology complication rates, having requested cancellation of Patient A's surgical bill, having advised Patient A to bring a medical malpractice action, having reported NMC to the Attorney General's Office and JCAHO, and for the purpose of embarrassing and harassing Dr. Long, provoking him to manifest intemperate reactions which would then be characterized as severe behavioral disturbances adversely affecting patient care to generate after-the-fact support for the aforesaid false and malicious defamatory letter.

268.     In his aforesaid March 8, 2004 letter, Hofstetter linked the disruptions that defendants in this suit had caused to Dr. Long's medical practice to the life-threatening infections in Dr. Long's patients.

269.     Hofstetter attached to his letter, *inter alia*, Chagnon's report which falsely, maliciously, and wrongfully stated, *inter alia*, that "in the span of time from 1/5/04 to 1/16/04 Dr. Long had two shoulder surgeries that became infected. One was a pinning and the other an arthroscopy." Chagnon knew or reasonably should have known that no such surgeries became infected.

270.     By falsifying the dates of the allegedly infected surgeries, Chagnon wrongfully and maliciously created the false appearance that Dr. Long had performed surgeries that became infected after his documented discovery of the aforesaid Notice on December 25, 2003 and his receipt of Gregoire's false letter dated December 31, 2003.

271.     Chagnon knew or reasonably should have known that the infected surgeries had occurred on December 9, 2003 and December 23, 2003, prior to Dr. Long's discovery of the Notice and receipt of Gregoire's aforesaid letter.

272.     Further, Chagnon knew or reasonably should have known that none of the infections had occurred during a pinning operation. Both of the referenced infections occurred during arthroscopic shoulder surgery.

273.     By falsifying the type of surgery that had become infected, Chagnon falsely and maliciously eliminated the irrigation solution and instruments used during arthroscopy and open shoulder surgery as common denominators in the infected surgeries.

274.     By falsely and maliciously eliminating the irrigation solution and instruments as common denominators, Chagnon falsely and maliciously attempted to isolate and portray Dr. Long as the single common denominator in all the infected surgeries.

275.     On or about March 25, 2004, during the MEC's corrective action investigation of Dr. Long, Chagnon falsely and maliciously advised the MEC that Dr. Long was the only common denominator in the infected surgeries.

276.     In her report, Chagnon falsely, maliciously, and wrongfully stated, *inter alia*, that the measures taken by Dr. Long to successfully prevent the recurrence of infections were extreme, made "no sense in regard to the prevention of infection," and increased the risk of infection. Chagnon knew or reasonably should have known that the measures taken by Dr. Long were successful in preventing further infections and were in no way extreme.

277.     In her report, Chagnon falsely, maliciously, and wrongfully stated, *inter alia*, that Dr. Long had caused two nurses to resign. Chagnon knew the references nurses resigned

due to working conditions prevailing in NMC's operating room caused by persons other than Dr. Long, including Chagnon.

278.    On or about March 12, 2004, unknown to Dr. Long, Duncan convened a MEC meeting wherein Hofstetter initiated a request for a corrective action against Dr. Long. At aforesaid meeting, Duncan appointed Salomone to convene an Ad Hoc Committee ("AHC") to conduct an investigation; at no time did any defendant in this suit notify Dr. Long that he was under investigation.

279.    Duncan had previously assured Dr. Long that there was a "cooling off" period in effect wherein, if Hofstetter had a problem with Dr. Long, that concern would be conveyed to Dr. Long by Duncan.

280.    Contrary to the terms of the "cooling off" period, Duncan did not advise Dr. Long of Hofstetter's March 8, 2004 letter, and Duncan maliciously and wrongfully conducted a secret proceeding whereby Salomone convened the AHC.

281.    On or about March 12, 2004, Salomone convened a meeting of the AHC, which included, among others, Mason, who was at the time a partner of Burfoot, Roberts, and Adamsons. At aforesaid meeting:

    a.   Mason maliciously, falsely, and wrongfully represented, *inter alia*, that he had no conflict of interest and could conduct the investigation of Dr. Long fairly and impartially. Salomone knew or reasonably should have known that Mason had a glaring conflict of interest, in that he was partners with Burfoot, Roberts, and Adamsons, all of whom Dr. Long had cited as aforesaid;

    b.   Mason maliciously, falsely, and wrongfully represented, *inter alia*, that Dr. Long was technically incompetent as a surgeon;

c. Chagnon falsely, maliciously, and wrongfully represented that Lamb had thoroughly investigated the aforesaid infections. Chagnon knew or reasonably should have known that no legitimate investigation of the infections occurred;

d. Chagnon falsely, maliciously, and wrongfully represented that Dr. Long was incompetent as a surgeon; and

e. Salomone falsely, maliciously, and wrongfully represented that laboratory testing did not support Dr. Long's report that the irrigation solution provided by NMC for Dr. Long's surgery on February 6, 2004 was contaminated. Salomone knew or reasonably should have known that laboratory testing of the aforesaid irrigation solution demonstrated heavy contamination with 800 colony forming units per milliliter of the deadly bacterium coagulase positive *Staphylococcus aereus*.

282. On or about March 15, 2004, Salomone reconvened the AHC. Dr. Sobel, a psychiatrist at NMC, attended that meeting as a consultant. Dr. Long remained unaware that the AHC was investigating his conduct. At aforesaid meeting:

a. Gregoire, Sutton, Chagnon, and Salomone falsely and maliciously misrepresented their interactions with Dr. Long and the history of aforesaid infections;

b. Based on the aforesaid false and malicious misrepresentations, the AHC recommended that Dr. Long undergo a psychiatric examination;

c. The AHC instructed Lamb to conduct a review of the infections; and

d. The AHC concluded that Dr. Long would no longer be allowed to take the protective measures which had, to that point, successfully prevented further surgical infections.

283.     At no time was Dr. Long afforded the opportunity to appear before the AHC to

confront or question his accusers or to meet with the AHC to present the facts pertaining

to the aforesaid events including the Notice, the life-threatening infections, or the

contaminated irrigation solution.

284.     At no time did the AHC consult an orthopedic surgeon or an infectious disease

expert to determine the circumstances surrounding the life-threatening infections or the

contaminated irrigation solution.

285.     By letter dated March 16, 2004 to Duncan, Salomone, speaking on behalf of the

AHC, wrongfully, maliciously, and without basis recommended, *inter alia*, that Dr. Long

undergo a psychiatric examination, citing the protective measures taken by Dr. Long to

protect his patients from further infections as "disruptive and problematic" behavior.

286.     Aware that no legitimate investigation of the life-threatening infections and the

contaminated irrigation solution was being conducted, Dr. Long requested that his

counsel report these matters to JCAHO.

287.     On or about March 15, 2004, Dr. Long's counsel reported the aforesaid conduct

by the defendants in this suit to JCAHO.

288.     On or about March 22, 2004, Hofstetter wrongfully and in violation of the

Medical Staff Bylaws suspended Dr. Long's Active Staff Privileges at NMC, alleging

that Dr. Long was delinquent in completing medical records.

289.     Salomone, in violation of Medical Staff Bylaws, had not provided the required

notification and warning to Dr. Long prior to Hofstetter's suspension of Dr. Long's

privileges. Hofstetter and Salomone knew or reasonably should have known that Dr.

Long was not subject to suspension as aforesaid without prior notification by his service chief, Salomone, that his medical records were incomplete.

290.     Hofstetter's suspension of Dr. Long's Active Staff Privileges as aforesaid was in violation of the Medical Staff Bylaws and for purposes of harassment and retaliation as aforesaid.

291.     Hofstetter wrongfully, maliciously, and in violation of the Medical Staff Bylaws suspended Dr. Long's privileges in furtherance of the aforesaid conspiracy in restraint of trade, and in retaliation for Dr. Long's having demanded release of the aforesaid complication rates, having advised Patient A to bring a medical malpractice action, having reported NMC to the Attorney General's Office, and for the purpose of harassing and provoking Dr. Long to manifest intemperate reactions which would then be characterized as "severe behavioral disturbances adversely affecting patient care" to generate after the fact support for Burfoot's false and malicious defamatory letter.

292.     On or about March 22, 2004, the MEC, chaired by Duncan and attended by Salomone, convened and accepted the AHC's unfounded and malicious recommendations that, *inter alia*, Dr. Long undergo a psychiatric evaluation, that he be prevented from taking measures to prevent further infections, and that Dr. Long's surgical cases, which had been found by SSSQA to have met applicable standards of care, be reviewed by outside experts.

293.     Dr. Long remained unaware that the MEC was investigating his conduct. At no time during the proceedings was Dr. Long afforded the opportunity to appear before the MEC to confront or question his accusers or to make an organized presentation of the

facts pertaining to the aforesaid events including, *inter alia*, the radiology posting, the life-threatening infections, and the contaminated irrigation solution.

294.     At no time did the MEC consult an infectious disease expert to determine the circumstances surrounding the life-threatening infections or the contaminated irrigation solution. Instead, the MEC directed Lamb to conduct a review of the infections.

295.     Unaware of the aforesaid investigations by the AHC and MEC, but aware that no legitimate investigation into the circumstances surrounding the life-threatening infections and contaminated solution had occurred, by letter dated March 29, 2004, Dr. Long's counsel demanded, *inter alia*, that psychiatric experts specializing in corporate psychopathology be brought in to study Hofstetter's retaliatory behavior as part of a root cause analysis of the aforesaid surgical infections and contaminated irrigation solution.

296.     NMC refused to consult the aforesaid expert or to conduct any legitimate investigation of the aforesaid events or root cause analysis of the life-threatening infections.

297.     On or about April 1, 2004, Salomone convened a meeting of SSSQA, with Hofstetter participating. At aforesaid meeting, Sutton and Gregoire falsely and maliciously misrepresented the facts and circumstances surrounding, *inter alia*, the Notice and reduction in Dr. Long's privileges as aforesaid. Further, at aforesaid meeting, Lamb falsely and maliciously advised SSSQA that Dr. Long was the single common denominator in the aforesaid infected surgeries.

298.     Despite Salomone's previous written assurances to Dr. Long that Dr. Long would be invited to appear before the SSSQA and present the facts concerning the contents of

his January 12, 2004 letter to Salomone, Dr. Long was never afforded the opportunity to appear.

299.     At no time was Dr. Long afforded the opportunity to appear before SSSQA to confront or question his accusers or to meet with SSSQA to present the facts pertaining to the matters set forth in his January 12, 2004 letter.

300.     At no time did SSSQA consult with an infectious disease expert to determine the circumstances surrounding the life-threatening infections or the contaminated irrigation solution.

301.     On or about March 31, 2004, at the same time that they were demanding that Dr. Long undergo a psychiatric evaluation and that his surgical cases (previously found by the SSSQA to have met applicable standards of care) be referred for an external review, Hofstetter, Duncan, and Salomone approved special privileges for Dr. Long, effective April 1, 2004, and under which Dr. Long would be allowed to perform reverse ball and socket total shoulder replacement surgery at NMC.

302.     The reverse ball and socket total shoulder replacement surgery is one of the most technically challenging and difficult operations in all of orthopedics, requiring special training, certification, and skill.

303.     The aforesaid reverse ball and socket total shoulder replacement surgery was unexpectedly delayed on the day of surgery. During the delay, the patient, who had no infection upon admission to NMC, developed an unexplained pulmonary infection in the preoperative holding area after receiving a nebulizer treatment prior to the surgery, and Dr. Long therefore canceled the surgery.

304.     The aforesaid pulmonary infection was found to be caused by the bacteria

*Serratia marcescens*, one of the types of bacteria previously acquired by NMC that,

according to the later Jarvis Report, had been used to deliberately contaminate at least

one of Dr. Long's previous surgeries. Had the surgery not been delayed, that patient's

infection would very likely have manifested as a serious complication during the

operation.

305.     On or about March 26, 2004, Duncan advised Dr. Long for the first time that

Hofstetter had recommended a corrective action against Dr. Long. Citing strict

confidentiality, Duncan refused to provide Dr. Long with any further information

concerning the corrective action.

306.     On or about April 5, 2004, Dr. Long and his counsel appeared before the MEC to

be interviewed. For the first time, Dr. Long was provided with documents pertaining to

the corrective action, including, *inter alia*, Salomone's letter dated March 16, 2004 and

Hofstetter's letter dated March 8, 2004.

307.     This was the first occasion that Dr. Long became aware of the nature of the

corrective action, certain of the false and malicious misrepresentations of fact by the

defendants in this suit, and the malicious restrictions and requirements that were to be

placed on his ability to care for his patients and practice at NMC. It was also the first

occasion that Dr. Long became aware that, based on the false and malicious

misrepresentations of fact by the defendants in this suit, he was to be required to undergo

a psychiatric evaluation.

308.     At the aforesaid April 5, 2004 meeting, the MEC, under the guidance of Duncan,

Salomone, and Hofstetter, concluded that Dr. Long would not be permitted to perform

surgery unless he underwent a psychiatric evaluation, and failure to undergo such examination would result in a summary suspension of his privileges.

309. At the aforesaid April 5, 2004 meeting, the MEC, under the guidance of Duncan, Salomone, and Hofstetter, attempted to discredit the findings that the irrigation solution had been contaminated as aforesaid. At no time did the MEC consult an infectious disease expert to determine the circumstances surrounding the life-threatening infections or the contaminated irrigation solution. At no time as Dr. Long afforded an opportunity to confront of question his accusers.

310. The MEC relied on the false and malicious reports by Lamb and Chagnon that Dr. Long was the single common denominator in the life-threatening infections.

311. Citing, *inter alia*, the protective measures successfully implemented by Dr. Long to prevent further infections and the malicious misrepresentations of the defendants in this suit as established fact, the MEC wrongfully and without justification recommended to the Board of Governors that Dr. Long's privileges be suspended pending a psychiatric evaluation.

312. On or about April 6, 2004, Hofstetter wrote to Dr. Long advising, *inter alia*:

a. Dr. Long must agree to undergo a psychiatric evaluation within 24 hours or have his hospital privileges suspended;

b. Dr. Long must agree not to perform surgery pending the psychiatric evaluation or face suspension of his privileges; and

c. Dr. Long had thirty days to request a fair hearing review of the aforesaid action by NMC's MEC.

313.     Attached to the aforesaid letter was a notice of correction action stating that the

measures taken by Dr. Long to prevent further surgical infections were disruptive of

NMC's procedures and constituted the basis for the requirement that Dr. Long undergo a

psychiatric evaluation within 24 hours.

314.     As with the aforesaid false and defamatory letters and Notice, the imposition of

these unwarranted conditions, including the requirement that Dr. Long no longer take

measures to prevent infections, constituted a serious reduction of Dr. Long's Active Staff

Privileges.

315.     Dr. Long was faced with a serious dilemma affecting patient safety and welfare in

that, as possessor of Active Staff Privileges at NMC, he was required to continue to

perform emergency surgeries while on the emergency call schedule, but if he did perform

emergency surgeries, he would not be permitted to take the simple but effective steps that

he had instituted to prevent further infections.

316.     Given these unwarranted conditions, Dr. Long could not in good conscience

continue to perform surgeries at NMC, nor could he refuse to perform surgeries while on

emergency call since that would also pose an unacceptable risk to patient welfare.

317.     On or about April 7, 2004, faced with the ongoing wrongful, illegal, and

malicious actions of the defendants of this suit, Dr. Long, under duress orchestrated by

the defendants of this suit as aforesaid, and no longer able to take the aforesaid protective

measures on behalf of his patients, resigned his Active Staff Privileges.

318.     Dr. Long's Active Staff Privileges were constructively terminated by the

defendants of this suit whose actions substantially impaired, hampered, and made

impossible his continued practice at NMC and pursuit of his practice as an orthopedic surgeon.

319.      By their wrongful, malicious, and illegal actions, the defendants in this suit, *inter alia*, maliciously, falsely, and publicly smeared and defamed Dr. Long as mentally unstable, a danger to patients, and incapable of safely practicing his profession; further, such actions made it impossible for Dr. Long to continue to practice at NMC while utilizing the aforesaid infection control procedures.

320.      It is believed and averred that the wrongful, malicious, and illegal actions of the defendants in this suit were informed by, and consistent with, standard retaliatory schemes and destructive practices utilized elsewhere by healthcare organizations against physicians which have been widely reported in the news media.

321.      Pursuant to these standard retaliatory schemes and destructive practices as reported in the news media, physicians who question or challenge their hospitals' healthcare standards are routinely smeared and defamed as, *inter alia*, disruptive, mentally unstable, and unfit to practice their professions.

322.      On or about April 30, 2004, unknown to Dr. Long, NMC wrongfully, illegally, and in violation of the Medical Staff Bylaws and the express terms of Hofstetter's letter which gave Dr. Long thirty days to request a fair hearing, notified the National Practitioner Data Bank that Dr. Long had resigned while facing a corrective action.

323.      The aforesaid notification to the National Practitioner Data Bank has further damaged Dr. Long by severely impairing his ability to practice his profession elsewhere. It has forever falsely and maliciously branded Dr. Long as a "problem doctor," virtually

eliminating his ability to obtain employment elsewhere in the United States as an orthopedic surgeon.

324.     On or about May 4, 2004, within the thirty-day notice period provided in Hofstetter's letter and numerous times since then, Dr. Long, by counsel, has timely demanded a fair hearing as provided in the Medical Staff Bylaws and Hofstetter's April 6, 2004 letter. As aforesaid, Dr. Long made repeated demands for a fair hearing prior to resigning from NMC staff.

325.     By his demands for a fair hearing, Dr. Long sought to exercise his due process contractual rights under the Bylaws to convene a jury of impartial persons drawn from outside NMC to review the actions of the parties as aforesaid, and render a binding decision for corrective action to redress the wrongful actions of defendants in this suit and remove the unwarranted conditions preventing him from taking the simple, inexpensive, and effective steps to prevent further surgical infections.

326.     NMC wrongfully, illegally, and in violation of the Medical Staff Bylaws, refused Dr. Long's numerous requests for a fair hearing.

327.     Soon after Dr. Long's resignation, NMC, acting at Hofstetter's direction, referred a substantial number of Dr. Long's surgical cases to the Board of Medical Practice ("BMP"), the medical licensing authority for the State of Vermont. NMC falsely, maliciously, and in bad faith referred the aforesaid cases as proof that Dr. Long had failed to meet applicable standards of care and should lose his medical license.

328.     The referral of Dr. Long's surgical cases to the BMP was unwarranted, malicious, in bad faith, and calculated to further harm, harass, and threaten Dr. Long, destroy his

professional career as an orthopedic surgeon, and eliminate him as a competitor to Archambault and NMC.

329.     After investigation and review, the BMP determined that Dr. Long had met the applicable standard of care in every case.

330.     Beginning in the summer of 2004, Archambault entered into a business relationship with NMC, conducting his practice from an office owned and operated by NMC, and with NMC providing all radiology services to Archambault.

331.     It is believed and averred that the proceeds of Archambault's practice as an orthopedic surgeon inure, in whole or in part, to the benefit of NMC and therefore Triad and QHR.

332.     NMC has wrongfully engaged private investigators to investigate Dr. Long, with the intent of harassing, intimidating, and provoking Dr. Long for the purpose, *inter alia*, of eliciting what could later be characterized as an emotionally unstable or paranoid reaction by Dr. Long in support of the illegal and wrongful purposes as aforesaid.

333.     Without justification, NMC maliciously advised the BMP that Dr. Long should undergo a psychiatric evaluation.

334.     The aforesaid actions of all defendants in this suit were not taken in furtherance of patient safety and welfare or legitimate peer review but were illegally, wrongfully, maliciously, and in violation of the Medical Staff Bylaws, undertaken in furtherance of the aforesaid conspiracy in restraint of trade and in retaliation for, *inter alia*, Dr. Long's having demanded release of the aforesaid complication rates, having advised Patient A to pursue a medical malpractice action, having reported NMC to the Attorney General's Office and JCAHO, and for the purpose of intimidation and to harass and provoke Dr.

Long to manifest intemperate reactions which could then be falsely and maliciously characterized as behavioral disturbances and disruptions of NMC's operations.

The National Practitioner Data Bank ("the NPDB")

335.     The NPDB was created by the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 et. seq. ("the Act"). It was premised upon the following observations:

The Congress finds the following:

(1) The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.

(2) There is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance.

(3) This nationwide problem can be remedied through effective professional peer review…

42 U.S.C. § 11101. Persons participating in professional peer review receive qualified immunity for liability in damages, but *only if* the peer review activities in question meet rigorous "notice and hearing procedures" mandated by the Act. 42 U.S.C. §§ 11111(a), 11112(a)(3), 11112(b). Adequate notice and hearing procedures must include, *inter alia*,

(a) Formalized notice of peer review, a statement of reasons for the peer review, and a statement that the physician has a right to request a hearing on the proposed action;

(b) If a hearing is requested, the physician must receive notice of the place, time, and date of the hearing, and a witness list; and

(c) A hearing before an arbitrator, hearing officer or panel, at which the physician has the right to be represented by counsel, have a formal record made, call and examine witnesses, present evidence, submit a written statement, and receive a written decision regarding the peer review.

336.     The Act also authorizes HHS to create the NPDB, 42 U.S.C. § 11134, and embodies certain reporting requirements, which are directly at issue here. First, the Act requires reporting to the NPDB of payments by defendants in satisfaction of medical malpractice actions or claims. 42 U.S.C. § 11131. Second, sanctions imposed by state boards of medical examiners must be reported to the NPDB.[1] 42 U.S.C. § 11132. Finally—and most significantly in the context of this action—the Act requires reporting by hospitals and other health care entities:

42 U.S.C. § 11133. Reporting of certain professional review actions taken by health care entities.

(a) Reporting by health care entities

(1) On physicians

Each health care entity which—

(A) Takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days;

(B) Accepts the surrender of clinical privileges of a physician—

---

[1] The term "Board of Medical Examiners" is defined by the Act as including "a body comparable to such a Board (as determined by the State) with responsibility for the licensing of physicians and also includes a subdivision of such a Board or body."

(i)      While the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct; or

(ii)     In return for not conducting such an investigation or proceeding; or

(C) In the case of such an entity which is a professional society, takes a professional review action which adversely affects the membership of a physician in the society, shall report to the Board of Medical Examiners, in accordance with § 11134(a) of this title, the information described in paragraph (3).

\*      \*      \*

(b) Reporting by Board of Medical Examiners

Each Board of Medical Examiners shall report, in accordance with § 11134 of this title, the information reported to it under subsection (a) of this section and known instances of a health care entity's failure to report information under subsection (a)(1) of this section.

337.     Hospitals are obligated to request information from the NPDB regarding any physician who applies for clinical privileges, and once every two years for every physician holding clinical privileges. 42 U.S.C. § 11135.

338.     The Act's only provision regarding disputed NPDB entries appears at 42 U.S.C. § 11136: <u>Disclosure and correction of information.</u>

With respect to the information reported to the Secretary under [the Act] respecting a physician or other licensed health care practitioner, the Secretary shall, by regulation, provide for—

(1) Disclosure of the information, upon request, to the physician or practitioner; and

(2) Procedures in the case of disputed accuracy of the information.

339.     The regulation implementing 42 U.S.C. § 11136 appears at 45 CFR § 60.21. § 60.21(b) provides instruction for the subject of the report or his/her designated representative to dispute the accuracy of a report both with the reporting entity, and if discussions with the reporting entity fail to resolve the dispute, § 60.21(c) provides instruction for requesting a review of the disputed report by the Secretary:

45 CFR § 60.21(b): Procedures for disputing a report with the reporting entity.

(1) If the subject disagrees with the reported information, the subject must request in the format as determined by the Secretary that the NPDB enter the reported into "disputed status."

(2) The NPDB will send the report, with a notation that the report has been placed in "disputed status," to queriers (where identifiable), the reporting entity, and the subject of the report.

(3) The subject must attempt to enter into discussion with the reporting entity to resolve the dispute. If the reporting entity revises the information originally submitted to the NPDB, the NPDB will notify the subject and all entities to whom reports have been sent that the original information has been revised. If the reporting entity does not revise the reported information or does not respond to the subject within 60 days, the subject may request that the

Secretary review the report for accuracy. The Secretary will decide whether to correct the report within 30 days of the request. This time frame may be extended for good cause. The subject may also provide a statement to the NPDB, either directly or through a designated representative that will permanently append the report.

45 CFR § 60.21(c): Procedures for requesting a review of a disputed report.

(1) The subject must request, in the format as determined by the Secretary, that the Secretary review the report for accuracy. The subject must return this request to the NPDB along with appropriate materials that support the subject's position. The Secretary will only review the accuracy of the reported information and will not consider the merits or appropriateness of the action or the due process that the subject received.

(2) After the review, if the Secretary:

    (i)    Concludes that the information is accurate and reportable to the NPDB, the Secretary will inform the subject and the NPDB of the determination. The Secretary will include a brief statement (Secretarial Statement) in the report that describes the basis for the decision. The report will be removed from "disputed status." The NPBD will distribute the corrected report and statement(s) to previous queriers (where identifiable), the reporting entity and the subject of the report.

    (ii)    Concludes that the information contained in the report is inaccurate, the Secretary will inform the subject of the determination and direct the NPDB or the reporting entity to revise the report. The Secretary

will include a brief statement (Secretarial Statement) in the report describing the findings. The NPDB will distribute the corrected report and statement(s) to previous queriers (where identifiable), the reporting entity and the subject of the report.

(iii)   Determines that the disputed issues are outside the scope of the Department's review, the Secretary will inform the subject and the NPDB of the determination. The Secretary will include a brief statement (Secretarial Statement) in the report describing the findings. The report will be removed from "disputed status." The NPDB will distribute the report and the statement(s) to previous queriers (where identifiable), the reporting entity and the subject of the report.

(iv)   Determines that the adverse action was not reportable and therefore should be removed from the NPDB, the Secretary will inform the subject and direct the NPDB to void the report. The NPDB will distribute a notice to previous queriers (where identifiable), the reporting entity and the subject of the report that the report has been voided.

340.    Neither the Act not its implementing regulations provide for notice to the subject of a report prior to entering the report into the NPDB, or for a meaningful hearing at which the subject could dispute the accuracy of the report.

Dr. Long Attempts to Have the Adverse Action Report Voided in Compliance with Statute

341.     On or about August 29, 2011, Dr. Long wrote to NMC requesting that it void its 2004 Adverse Action Report.

342.     On or about September 9, 2011, NMC refused to void the 2004 Adverse Action Report against Dr. Long.

343.     On or about November 3, 2011, Dr. Long sought review of the Adverse Action Report by the Secretary.

344.     On or about December 20, 2011, the Secretary requested that NMC provide evidence supporting the *bona fides* of its Adverse Action Report.

345.     On or about January 31, 2012, NMC's CEO, Jill Berry Bowen, responded to the Secretary's request ("Bowen Response"). The Bowen Response was knowingly false and fraudulent because, at the time of its writing, NMC knew or reasonably should have known:

   a.   That Dr. Long's patients had been intentionally infected in order to create a foundation for a fraudulent and malicious peer review;

   b.   That a fraudulent and malicious peer review or investigation predicated on deliberately harming patients does not qualify as an action taken in furtherance of quality healthcare, and is not an "investigation" or "peer review" action pursuant to the intent of the Act;

   c.   That a fraudulent and malicious peer review or investigation predicated on deliberately contaminating surgical patients in order to falsely create complications to form the basis of a corrective action against Dr. Long is antithetical to any action taken in furtherance of quality healthcare;

d.  That because no legitimate investigation or peer review was underway when Dr. Long surrendered his Active Staff Privileges, he did not and could not have voluntarily surrendered his clinical privileges while under, or to avoid, investigation relating to professional competence or conduct, as NMC reported to the NPDB;

e.  That Dr. Long's resignation during a fraudulent and malicious investigation or peer review predicated on deliberately contaminating his surgeries in order to blame him for the ensuing infections as aforesaid is not a reportable event to the NPDB;

f.  That a legitimate independent investigation of the infections would have revealed that Dr. Long's patients were being intentionally infected;

g.  That the fraudulent and malicious peer review of Dr. Long, and actions NMC took subsequent to the fraudulent and malicious peer review were not, for the aforesaid reasons, taken (i) in the reasonable belief that the actions were in furtherance of quality healthcare; (ii) after a reasonable effort to obtain the facts of the matter; and (iii) in the reasonable belief that the action was warranted by the facts after reasonable effort to obtain the facts;

h.  That Dr. Long's patients were intentionally infected through extrinsically and intentionally contaminated irrigation fluid (or other fluid, medications, equipment, or materials) provided by NMC personnel and used by Dr. Long in those patients' surgeries;

i.  That Dr. Long could not have, and did not, resign to avoid a legitimate investigation; and

      j.    That Dr. Long resigned because his surgical cases were being deliberately contaminated, and NMC (i) had refused to properly investigate the deliberate contamination, and (ii) was attempting to falsely blame Dr. Long for the infections that had resulted from the deliberate contaminations, and (iii) had demanded that he cease using protective measures that had prevented further contamination of his surgeries.

346.      On or about February 27, 2012, the Secretary refused to void Dr. Long's Adverse Action Report, stating that "there is no reason to conclude that the report should not have been filed or that for agency purposes it is not accurate, complete, timely or relevant. Accordingly, the report shall be maintained as submitted by the reporting entity." The Secretary's decision also notes that some of the issues raised by Dr. Long are beyond the scope of his or her review authority.

## COUNT I

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

347.      Paragraphs 1 – 346 are hereby re-alleged.

348.      The Administrative Procedure Act ("The APA"), 5 U.S.C. § 702, provides that a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. Dr. Long continues to suffer a legal wrong because of HHS and the Secretary's refusal to remove the Adverse Action Report regarding him from the NPDB; therefore, he is entitled to judicial review of the actions of HHS and the Secretary.

349.     HHS and the Secretary failed to determine that the scant procedural protections included in the Act and its regulations were followed with respect to Dr. Long. In at least the following respects, these procedures were not followed:

a.     42 U.S.C. § 11112(a) provides, *inter alia*, that a professional review action must be taken (1) in the reasonable belief that the action was in furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

1.     42 U.S.C. § 11112(a)(2): Defendants refused to remove Dr. Long's Adverse Action Report from the NPDB despite the fact that neither NMC nor its agents/employees made a reasonable effort to obtain the facts of the matter. Despite repeated requests for a fair hearing, Dr. Long was not informed that an investigation into his conduct was instigated until after Hofstetter recommended a corrective action against Dr. Long after multiple meetings on the matter had occurred without Dr. Long being afforded the opportunity to confront and question his accusers, much less to present his own statements and supporting materials. Any effort to obtain the facts of the matter do not rise to the level of reasonableness where NMC and its agents/employees failed or outright refused to notify Dr. Long of the pending proceedings against him,

to allow him to confront and question his accusers, and to submit a statement with supporting materials.

2. 42 U.S.C. § 11112(a)(3): Defendants refused to remove Dr. Long's Adverse Action Report from the NPDB despite the fact that Dr. Long was not afforded adequate notice and hearing. Dr. Long was unaware that a corrective action investigation against him had commenced until after a final recommendation had been made. After resigning his Active Staff Privileges under duress, Dr. Long requested a fair hearing multiple times within the thirty-day period promised in Hofstetter's letter and was consistently denied such hearing or ignored.

3. 42 U.S.C. § 11112(a)(4): Defendants refused to remove Dr. Long's Adverse Action Report from the NPDB despite the fact that they could not have reasonably concluded that the Adverse Action Report was submitted in the reasonable belief that the action was warranted by the facts known after a reasonable effort to obtain such facts and after meeting the notice and hearing requirements. As aforesaid, any effort to obtain the facts in the matter fell far short of being reasonable since Dr. Long was excluded from all proceedings, and NMC failed to provide him reasonable notice and hearing despite his repeated timely requests for a fair hearing.

b. 42 U.S.C. § 11112(b) provides, *inter alia*, that the adequate notice and hearing requirements of the statute are satisfied where the physician has been given notice stating that a professional review action has been proposed to be taken against

him; the reasons for the proposed action; that the physician has the right to request a hearing on the proposed action within 30 days; and a summary of his rights.

1. Defendants refused to remove Dr. Long's Adverse Action Report from the NPDB despite the fact that Dr. Long did not receive proper notice of the proposed action against him. He was unaware that a corrective action investigation was underway until after Hofstetter had made a final recommendation that he undergo a psychiatric evaluation and be prohibited from enjoying his Active Staff Privileges, to wit, the prohibition on his performing surgeries until he underwent a psychiatric evaluation. Dr. Long was not given reasons for the proposed action or a summary of his rights pursuant to the statute.

c. 42 U.S.C. § 11112(b)(2) and 42 U.S.C. § 11112(b)(3) provide, *inter alia*, that if a hearing is timely requested, the physician must be given notice stating the time, place and date of the hearing, and a list of witnesses expected to testify at the hearing on behalf of the professional review body, if any. The hearing is to be before an arbitrator mutually acceptable to the physician and the healthcare entity, or before a hearing officer or panel of individuals appointed by the entity and who is not in direct economic competition with the physician involved. The physician has the right to representation by an attorney or other person of his choice, to have a record made of the proceedings and copies thereof, to call, examine, and cross-examine witnesses, to present evidence deemed relevant by the hearing officer, and to submit a written statement at the end of the hearing. Upon completion of the hearing, the physician has the right to receive the written recommendation of

the arbitrator, officer or panel, including a statement of the basis for the recommendation, and to receive a written decision of the healthcare entity, including a statement of the basis of the decision.

1. Defendants refused to remove Dr. Long's Adverse Action Report from the NPDB despite the fact that Dr. Long was not afforded the opportunity to utilize any of these procedural safeguards and the fact that his timely and multiple requests for a fair hearing were repeatedly denied or ignored despite the promises stated in Hofstetter's letter.

350. No factual predicate existed which warranted or permitted NMC's report to the NPDB concerning Dr. Long, and the NPDB's publication of the entry relating to Dr. Long was and is therefore contrary to law, arbitrary, capricious, and a violation of Dr. Long's rights to procedural due process.

351. The APA, 5 U.S.C. § 706(2), provides that a reviewing court shall set aside an agency action that is taken without observance or procedure required by law, arbitrary or capricious, or contrary to a constitutional right. For the reasons set forth herein, the action taken by the NPDB violated those provisions, and therefore should be set aside.

## COUNT II

## PRIVATE CAUSE OF ACTION

352. Paragraphs 1 – 346 are hereby re-alleged.

353. A private right of action is implied by and under the Health Care Quality Improvement Act for physicians aggrieved by their inclusion in the NPDB.

354.     For the reasons set forth above, the actions taken by defendants violated the

provisions of the Health Care Quality Improvement Act and its enabling regulations.

Therefore, defendants' inclusion of Dr. Long in the NPDB should be set aside.


## COUNT III

## PROCEDURAL DUE PROCESS

355.     Paragraphs 1 – 346 are hereby re-alleged.

356.     Pursuant to the Act and its enabling regulations, Defendants refused to remove

Dr. Long's Adverse Action Report from the NPDB, despite the following violations of

Dr. Long's due process rights: NMC submitted derogatory information regarding Dr.

Long to the NPDB without any prior notice to Dr. Long that the submission was being

made. Moreover, Dr. Long was given no prior notice by NMC or the NPDB that this

derogatory entry had actually been entered into the NPDB and could be disseminated to

any inquiring hospital. Dr. Long was given no meaningful opportunity to contest the

procedure whereby the information was referred by NMC to the NPDB, or to dispute the

accuracy of the information supplied by NMC. The opportunity to submit a statement to

the Secretary is a completely inadequate procedural methodology for disputing these

issues.

357.     Dr. Long's inclusion in the NPDB implicates his liberty and property interests

pursuant to the due process clause of the Fifth Amendment to the United States

Constitution. It creates a tangible change in his status as a physician. It automatically

instigates an investigation by state medical licensing entities, thereby impairing his ability

to remain licensed as a physician in the several states in which he is licensed. It creates a

situation whereby hospitals which consider Dr. Long for privileges, or which grant him privileges, must request information about him from the NPDB, thus impairing Dr. Long's ability to obtain and retain privileges at hospitals. Moreover, it operates functionally to exclude Dr. Long from a variety of governmental and private employment opportunities, particularly those that might be considered high profile or otherwise subject to public scrutiny, thereby reducing his earning potential. It also impugns Dr. Long's professional reputation.

358.     At a minimum, Dr. Long's right to procedural due process, pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, as applied in accordance with its own terms, 42 U.S.C. § 1983, require that he be accorded notice prior to the referral of information by NMC to the NPDB; notice prior to the decision of the NPDB to include an entry regarding him; and a plenary hearing, with procedural safeguards similar to those set forth at 42 U.S.C. § 11112(b). The NPDB's failure or refusal to accord such procedural protections to Dr. Long, or to ensure that NMC had done so, requires that HHS be enjoined from maintaining its NPDB entry concerning him, and the HHS be required to notify all entities to whom information regarding Dr. Long has been disclosed that his NPDB entry has been withdrawn and nullified.

## PRAYER FOR RELIEF

Wherefore, Dr. Long prays that the Court enter the following forms of declaratory and injunctive relief against HHS, and that mandamus issue compelling same:

(1) Declare that the referral of information by NMC to the NPDC, and the publication of the NPDB entry regarding Dr. Long, were and are contrary to law;

(2) Enjoin HHS from continuing to include an NPDB entry regarding Dr. Long, and

affirmatively require HHS to inform each and every entity to which it had provided

information regarding Dr. Long that the NPDB entry regarding him has been withdrawn

and nullified; and

(3) Award Dr. Long his fees and costs incurred in connection with this action.

(4) Granting Dr. Long such other and further relief as the Court deems just and proper.


Respectfully submitted,


/s/ Barry Coburn

_____

Barry Coburn
D.C. Bar No. 358020
Coburn & Greenbaum, PLLC
1710 Rhode Island Avenue Northwest
Second Floor
Washington, D.C. 20036
(202) 643-9472