# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **RAYMOND A. LONG, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 18-cv-00458 (APM)** |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **HUMAN SERVICES, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## MEMORANDUM OPINION

## I.      INTRODUCTION

The Health Care Quality Improvement Act requires hospitals and other health care entities to file a report with the United States Department of Health and Human Services ("HHS") whenever a physician voluntarily resigns while under investigation for reasons related to his professional competence or conduct.  The report is then posted to an online database, which serves as a flagging system to alert hospitals and other would-be employers of potential issues with the physician's credentials.

Fifteen years ago, a hospital filed such a report about Plaintiff Dr. Raymond Long, stating that he resigned from the hospital's medical staff after the hospital initiated a corrective action investigation.  Plaintiff twice petitioned HHS to void the report, arguing, among other things, that the investigation did not pertain to his professional conduct or competence, and that he was not under investigation when he resigned.  HHS denied the petitions, and Plaintiff now seeks judicial review of those decisions.  He also seeks to introduce extra-record evidence.

For the reasons that follow, the court holds that HHS reasonably concluded that the investigation was not initiated for a prohibited purpose and that the investigation was ongoing when he resigned. No extra-record evidence is needed to make this determination. Therefore, HHS's motion for summary judgment is granted, and Plaintiff's motions for summary judgment and to permit the introduction of extra-record evidence are denied.

## II.    BACKGROUND

### A.    Legal Background

In 1986, Congress enacted the Health Care Quality Improvement Act ("HCQIA") to address the "increasing occurrence of medical malpractice" and the danger of "incompetent physicians . . . mov[ing] from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." Pub. L. 99-66, § 402(1)–(2), 100 Stat. 3743, 3784 (codified at 42 U.S.C. § 11101 *et seq.*). To remedy these concerns, the HCQIA prescribes mandatory peer review and reporting requirements for health care entities, 42 U.S.C. §§ 11131–11133, sets standards governing professional review actions, *id.* § 11112, and provides liability protection to professional review bodies and others who comply with those standards, *id.* § 11111(a)(1).

As relevant here, the HCQIA requires health care entities to file a report with HHS whenever the entity "accepts the surrender of clinical privileges of a physician . . . while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct." *Id.* § 11133(a)(1)(B). The report is published on the National Practitioner's Data Bank ("Data Bank"), 45 C.F.R. § 60.12, which serves as a "flagging system" to assist "hospitals and other health care entities in conducting extensive, independent investigations of the qualifications of the health care practitioners they seek to hire, or to whom they wish to grant

clinical privileges," *Leal v. Sec'y, U.S. Dep't of Health & Human Servs.*, 620 F.3d 1280, 1284 (11th Cir. 2010) (internal quotation marks omitted) (cleaned up). A physician may file a response, which will be published alongside the hospital's report of the incident. *See* 45 C.F.R. § 60.6(d)(2). Upon request, HHS will review the "accuracy of the reported information," but it "will not consider the merits or appropriateness of the action or the due process that the" reported physician received. *Id.* § 60.21(c)(1); *see also* 42 U.S.C. § 11136(2) (requiring HHS to establish "procedures in the case of disputed accuracy of the information"). HHS may revise or void the report if it determines that the report is inaccurate or that the adverse action was not reportable. *See* 45 C.F.R. § 60.21(c)(2)(ii), (iv).

## B. Factual Background

### 1. Plaintiff's Tenure at the Medical Center

Plaintiff is an orthopedic surgeon who, beginning in September 2001, obtained clinical privileges to practice at Northwestern Medical Center ("Medical Center"), a hospital in St. Albans, Vermont. Am. Compl., ECF No. 3 [hereinafter Am. Compl.], ¶¶ 10, 32. Plaintiff's relationship with staff at the Medical Center soured early on, which Plaintiff attributes to the fact that he was building an MRI machine that would have put him in direct competition with the hospital. *Id.* ¶¶ 24–41.

Between November and December 2003, Plaintiff conducted five shoulder surgeries that resulted in post-operative infections. Joint App'x, ECF No. 27 [hereinafter J.A.], at 67. Plaintiff hypothesized that the infections were deliberately caused by an "unknown person," and that the Medical Center was attempting to eliminate a potential source of competition by maligning his professional reputation. *See* Am. Compl. ¶¶ 64, 171, 178. He subsequently implemented various "corrective" measures designed to prevent additional infections, which a surgical services nurse

said were "extreme," "made no sense in regard to the prevention of infection," and actually increased the risk of infection. J.A. 69. The Vermont Attorney General's office initiated an investigation into the infections, *see id.* at 33, but that review apparently never concluded in any charges or accusations of wrongdoing, Oral Arg. Rough Tr. at 10 ¶¶ 10–17.

### 2. *The Medical Center's Investigation into Plaintiff*

On March 8, 2004, in response to these incidents and others, the Chief Executive Officer ("CEO") of the Medical Center sent a letter to the Chairman of the hospital's Medical Executive Committee ("MEC")—the governance committee for medical staff at the hospital—expressing "serious concern[]" that Plaintiff was causing "significant disruption[s] of hospital services." J.A. 33. The CEO requested that the Chairman determine whether Plaintiff's conduct could have "serious effects on patient outcome, especially in the operating room, as a result of delays in treatment, and a potentially increased risk for infections," and whether "corrective action should be initiated." *Id.*

Shortly thereafter, the MEC met and forwarded the request to the Chief of Surgical Services for investigation and recommendation. *Id.* at 31. The Chief of Surgical Services then convened an Ad Hoc Committee to assess the concerns expressed in the CEO's letter. After reviewing documentation and interviewing hospital staff, the Ad Hoc Committee unanimously concluded that there was "ample evidence" that Plaintiff had conducted himself in a "confrontational manner," caused disruptions that "undermine[d] the appropriate team approach to patient care," and inappropriately caused staff to deviate from established operating room protocol. *Id.* at 34. In a letter to the MEC dated March 16, 2004, the Ad Hoc Committee recommended, among other things, that Plaintiff undergo a psychiatric evaluation to ensure "patient safety and to determine if

there is a condition in need of treatment," and that his charts be sent for external review, including those charts that had already been reviewed internally. *Id.*

Over the next few weeks, the MEC reviewed Plaintiff's "extensive history" of disputes with hospital staff, and "repeatedly discussed numerous areas of concern" with Plaintiff. *Id.* at 36. In a letter to the Medical Center's Board of Directors dated April 5, 2004, the MEC outlined three recommended actions and "request[ed]" that they "be adopted by the Board." *Id.* First, it recommended that Plaintiff undergo a psychiatric evaluation within thirty days and authorize the MEC to review the results of that evaluation. *Id.* at 36–37. Plaintiff was to refrain from performing any surgical procedures pending the Committee's review of the psychiatric evaluation report, and his failure to comply would result in the summary suspension of his staff privileges. *Id.* at 37. Second, it recommended that outside infectious disease experts conduct a review of post-operative infections at the hospital that would "include, but not be limited to, the post-operative shoulder infections identified by" Plaintiff. *Id.* Third, it recommended an external review of Plaintiff's charts. *Id.*

By letter dated April 6, 2004, the Medical Center's CEO apprised Plaintiff of the MEC's recommendations. *Id.* at 38. Plaintiff was informed that his failure to comply with the recommended actions would result in the summary suspension of his medical staff privileges. *Id.* The letter stated that the Board of Directors would "take final action on the recommendations of the MEC" if Plaintiff did not file a request for a hearing within 30 days. *Id.* at 38–39.

### 3. *Plaintiff's Resignation and Report*

The following day, on April 7, 2004, Plaintiff submitted a resignation letter to the Medical Center. *Id.* at 41. On April 30, 2004, the Medical Center filed an Adverse Action Report with the Data Bank stating that Plaintiff had "voluntar[ily] surrender[ed] [his] clinical privilege(s) while

under, or to avoid, investigation relating to professional competence or conduct." *Id.* at 1. The Medical Center specified that Plaintiff had "resigned from medical staff following initiation of [a] corrective action investigation." *Id.* at 2. Plaintiff requested a hearing from the Medical Center on May 3, 2004, *id.* at 119, which apparently was never granted.

### 4. Administrative Review

On November 3, 2011, Plaintiff requested that HHS void the Adverse Action Report on the grounds that there was no reportable event and that the report was inaccurate, legally insufficient, and misleading. *Id.* at 10–11. After reviewing documentation supplied by the Medical Center, HHS issued a decision on February 27, 2012, denying Plaintiff's request. *Id.* at 42.

By letter dated July 9, 2018, Plaintiff asked that HHS reconsider its earlier decision, contending that the investigation was not ongoing when he resigned, the report was inaccurate, untimely, and incomplete, and that the investigation was based on a sham peer review stemming from Plaintiff's attempts to engage in competition with the hospital. *Id.* at 62–78. HHS issued a decision on September 26, 2018, denying Plaintiff's renewed request. *Id.* at 185–93. HHS concluded that the investigation was ongoing at the time he resigned, that the information Plaintiff provided "did not establish that the peer review was a sham," and that "there was no basis to conclude that the report should not have been filed or that for agency purposes it was not accurate, complete, timely or relevant." *Id.* at 192.

### C. Procedural History

Plaintiff now seeks review of HHS's determinations under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(2). He claims that HHS's refusal to void the Adverse Action Report was arbitrary and capricious because: (1) the report inaccurately states that the

investigation was related to Plaintiff's professional competence or conduct;[1] and (2) he was not under investigation at the time he resigned.  *See* Pl.'s Mot. for Summ. J., ECF No. 15, Pl.'s Mem. of P. & A. in Supp., ECF No. 15-1 [hereinafter Pl.'s Mem.], at 8; Pl.'s Cons. Opp'n to Defs.' Mot. and Reply to Defs.' Opp'n, ECF No. 22 [hereinafter Pl.'s Reply], at 2–5.  In addition, Plaintiff seeks leave to introduce an extra-record declaration by Dr. Lawrence Huntoon, a "nationally-known expert on professional review activity and sham peer review."  Pl.'s Mot. to Permit the Introduction of Extra-Record Evidence, ECF No. 21 [hereinafter Pl.'s Extra-Record Mot.], at 1–2.

## III.    LEGAL STANDARD

In cases involving review of final agency action under the APA, the court's review is limited to the administrative record, and "its role is limited to determining whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Philip Morris USA Inc. v. FDA*, 202 F. Supp. 3d 31, 45 (D.D.C. 2016) (cleaned up).  The court will uphold the agency's decision so long as it is "reasonable and reasonably explained."  *Nw. Corp. v. FERC*, 884 F.3d 1176, 1179 (D.C. Cir. 2018).  HHS's factual findings are conclusive if supported by "substantial evidence."  *See DOE v. Rogers*, 139 F. Supp. 3d 120, 149 (D.D.C. 2015).  This is not a demanding standard; it requires only "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

---

[1] Plaintiff's Motion for Summary Judgment also contends that the Adverse Action Report was untimely and incomplete because he did not receive a hearing from the Medical Center before it issued the Report.  *See* Pl.'s Mem. at 35–36.  Plaintiff did not pursue this argument in his reply brief or during oral argument, however, and for good reason.  The statutory authority that Plaintiff cites as entitling him to a hearing, 42 U.S.C. § 11112, outlines standards that health care entities must follow in order to receive liability protections; it has nothing to do with HHS's duty to review reports for accuracy.  The only case that Plaintiff cites in support of his argument involved another statute, the Privacy Act, not at issue in this case.  *See Doe v. Thompson*, 332 F. Supp. 2d 124, 129 (D.D.C. 2004).  Therefore, to the extent that Plaintiff did not abandon this argument, the court rejects it.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## IV. DISCUSSION

### A. HHS Reasonably Concluded that the Investigation Was Related to Plaintiff's Professional Competence or Conduct.

Plaintiff argues, in essence, that the Adverse Action Report is inaccurate and therefore must be voided because the Medical Center's investigation was not related to professional competence or conduct, as required by the HCQIA. *See* Pl.'s Mem. at 32; *see also* 42 U.S.C. §§ 11133(a)(1)(B)(i), 11151(9). Instead, he asserts, it was "primarily based on Plaintiff's competitive acts intended to solicit or retain business," and was therefore a "fraudulent, or sham, peer review." Pl.'s Reply at 26–27. He specifically contends that HHS (1) arbitrarily characterized the evidence that Plaintiff submitted to this effect as beyond the scope of its review and (2) failed to provide a reasoned explanation for its conclusion that the investigation was not for a prohibited purpose. Pl.'s Mem. at 33; Pl.'s Reply at 27–31. Neither of these arguments succeeds.

HHS's "review of information in the Data Bank is limited in scope." *Leal*, 620 F.3d at 1284. The HCQIA requires only that HHS promulgate regulations establishing "procedures in the case of disputed accuracy of the information." 42 U.S.C. § 11136(2). By regulation, HHS has guaranteed that it will "review the accuracy of the reported information" upon request, but it "will not consider the merits or appropriateness of the action or the due process that the subject received." 45 C.F.R. § 60.21(c); *see also id.* § 60.6(a). The agency "does not act as a factfinder deciding whether incidents listed in the report actually occurred or as an appellate body deciding whether there was sufficient evidence for the reporting hospital to conclude that those actions did occur." *Leal*, 620 F.3d at 1284. Nevertheless, HHS does have an obligation to verify that "the report accurately describes the adverse action that was taken against the physician." *Id.* Per the

agency's regulations and guidance, this duty includes verifying the factual accuracy of anything stated in the report. *See* 45 C.F.R. § 60.21(c); Nat'l Practitioner Databank Guidebook at F-3 (2001) ("2001 Guidebook").[2]  Thus, if a report describes a doctor's resignation as "voluntary" but the doctor puts forth "actual evidence" that a "reasonable mind might accept as adequate to support the conclusion that [the doctor's] resignation was obtained by fraud," then HHS must "properly consider this evidence" and "set forth [its] rationale for" accepting or rejecting it.  *Rogers*, 139 F. Supp. 3d at 149; *see also Simpkins v. Shalala*, 999 F. Supp. 106, 111 (D.D.C. 1998) (explaining that HHS would have no duty to determine whether a health care entity "acted correctly in suspending a doctor," but that it would be required to "review whether the entity in fact suspended the doctor" as indicated in the report).

In this case, Plaintiff submitted to HHS evidence suggesting that the Medical Center's investigation was not "relat[ed] to professional competence or conduct," J.A. 2, and was actually a pretext designed to eliminate a potential economic competitor, *see id.* at 80–138.  Accordingly, HHS had a duty to consider that evidence and set forth its rationale for accepting or rejecting it. *See Rogers*, 139 F. Supp. 3d at 149.  Plaintiff claims that HHS failed to "make a finding, based on the facts in the record, concerning these issues," Pl.'s Reply. at 27, but that is simply untrue. Though HHS took the position that some of Plaintiff's arguments were outside the scope of its review, it also addressed his key contentions head on, concluding that "[t]he record shows that the investigation was based on the furtherance of quality health care and not for other prohibited purposes," J.A. 191, and that "the information [Plaintiff] provided did not establish that the peer review was a sham," *id.* at 192.  HHS's analysis admittedly might have been more thorough, but

---

[2] Available at https://www.npdb.hrsa.gov/resources/ArchivedNPDBGuidebook.pdf.  HHS has published more recent editions of the Guidebook, but the court references the 2001 version because that was the edition in effect at the time the Medical Center filed its Adverse Action Report.

the court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974). The court cannot supply an explanation that the agency failed to give, but it may uphold an agency's reasoning even where it is "articulated only briefly and in a somewhat conclusory fashion." *Chiquita Brands Int'l Inc. v. SEC*, 805 F.3d 289, 299 (D.C. Cir. 2015).

In its letter rejecting Plaintiff's renewed request to void the Adverse Action Report, HHS identified a wealth of evidence in the record supporting its conclusion that Plaintiff resigned while under investigation for reasons related to his professional conduct or competence. J.A. 189–90. For instance, HHS cited the March 8, 2004, letter from the Medical Center's CEO and highlighted the fact that the letter discussed "serious concerns raised by [medical staff] related to the significant disruption of hospital services" Plaintiff had caused, which "resulted in Hospital departments having to alter long-standing procedures in order to work" with Plaintiff. *Id.* at 189. The agency then catalogued the Medical Center's step-by-step process of reviewing these concerns and developing interim recommendations, including the Ad Hoc Committee's letter to the MEC in which it unanimously concluded that there was "ample evidence" that Plaintiff had conducted himself in a "confrontational manner," caused disruptions that "undermine[d] the appropriate team approach to patient care," and inappropriately caused staff to deviate from established operating room protocol. *See id.* at 189, 34. HHS further noted that Plaintiff was ordered to undergo a psychological evaluation and that the MEC concurred with the Ad Hoc Committee's recommendations that all of Plaintiff's charts be sent for external review, including those that had already been reviewed internally. *Id.* at 189–90. A reasonable mind could easily accept this evidence as "adequate to support" HHS's conclusion that the investigation was related to Plaintiff's professional competence or conduct. *See Biestek*, 139 S. Ct. at 1154.

Plaintiff's contention that the investigation was a pretext, on the other hand, requires unsupported leaps in logic that run counter to the weight of evidence in the record. Plaintiff's theory, in a nutshell, is that he intended to enter into competition with the Medical Center by building an MRI machine, and that the hospital retaliated with a campaign of harassment that culminated in a sham investigation. Am. Compl. ¶ 171; *see also* Pl.'s Mem. at 32–33. In support, he argues that "the record contains evidence that surgical site infections afflicting Plaintiff's patients were deliberately caused by an unknown person or persons," Pl.'s Reply at 28, an allegation he admits "sounds preposterous on its face," *id.* at 3. However, the record also contains evidence that the hospital conducted a peer review of those same patients' medical records and identified a variety of potential sources of the infections, none of which was intentional contamination. *See* J.A. 123, 133–34. Furthermore, Plaintiff offered no evidence—only speculation—to establish that an agent of the Medical Center caused the purported contamination or otherwise used the infections as a pretext for the investigation. HHS had no obligation to conduct a de novo review to substantiate its rejection of Plaintiff's theory of malfeasance.

Likewise, the various bits of evidence that Plaintiff contends evince the Medical Center's "retaliatory motive," Pl.'s Mem. at 32–33 & n.3; Pl.'s Reply at 28–31, are at least equally supportive of the Medical Center's good faith efforts to ensure patient safety and fair treatment of its practitioners. For instance, Plaintiff makes much of the fact that the March 8, 2004, letter from the CEO to the MEC Chairman stated, "I would also remind you that [the Medical Center] is currently being investigated by the State Attorney General's office based on an anonymous telephone call they received regarding an alleged tampering of IV fluids in Dr. Long's cases." J.A. 33. According to Plaintiff, the "unexplained presence of this 'reminder' in a request for corrective action investigation suggests that the subsequent professional review activity had a retaliatory

motive." Pl.'s Mem. at 33 n.3. There are other more plausible explanations for the inclusion of this information in the letter. For one, the CEO tasked the MEC not only with deciding whether to initiate a corrective action against Plaintiff, but also with "consider[ing] whether these ongoing issues could have serious effects on patient outcomes," including "a potential increased risk of infections." J.A. 33. The court doubts that the MEC could make an informed conclusion in this regard without knowing of the allegations that the infections were deliberately caused. The CEO may have also wished to inform the MEC of the State's ongoing investigation so that the MEC would be aware of the gravity of the matter. "That the evidence in the record may also support other conclusions, even those that are inconsistent with [HHS's], does not prevent [the court] from concluding that [its] decisions were rational and supported by the record." *See Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1160 (D.C. Cir. 1980).

Plaintiff also cites as evidence of the Medical Center's purported bias a February 13, 2004, email from the Medical Center's Chair of the Board of Directors to the CEO suggesting the names of individuals who would serve on a "subcommittee." J.A. 104. Plaintiff argues that those individuals were intended to "serv[e] on Plaintiff's fair hearing committee," and that such subcommittee was formed weeks before any corrective action investigation had commenced demonstrates that it was a "foregone conclusion" that the Medical Center would render an adverse action against him. Pl.'s Reply at 28–29. There is nothing on the face of the email, however, linking the proposed subcommittee to Plaintiff. Even if it were true that the Board Chair intended the subcommittee to review Plaintiff's professional competence and conduct, nothing in the email indicates that that the outcome of that review was predetermined. The individuals identified in the email are described as "fair," "experienced," "thoughtful," "respected," and "open-minded," J.A. 104—qualities associated with a neutral, unbiased investigation, not a sham retaliation.

Lastly, Plaintiff wonders why the Medical Center would have expanded his operating privileges on April 1, 2004, when only a few weeks earlier the Ad Hoc Committee had recommended that he undergo a psychiatric evaluation in the interest of patient safety. *See* Pl.'s Reply at 29–30; J.A. 34, 154. If the hospital truly lacked confidence in his professional competence or conduct, he asks, why would it have granted him these additional responsibilities? Once again, Plaintiff ignores other, more plausible explanations for the Medical Center's actions. Though the Ad Hoc Committee had issued its own recommendations, the MEC had not yet formally adopted them. *See* J.A. 36. That the hospital granted him "temporary privileges to perform" one additional procedure, *id.* at 154, while the MEC was still deliberating about whether to adopt the Ad Hoc Committee's recommendations says nothing about the hospital's allegedly "retaliatory motives" in initiating the investigation.

In sum, HHS reasonably rejected Plaintiff's speculations and piecemeal evidence that the investigation was a sham designed to eliminate a would-be competitor. *See id.* at 192. Its conclusion that the Adverse Action Report accurately states that the investigation was related to Plaintiff's professional competence or conduct is supported by substantial evidence and therefore must be upheld.

### B. HHS Reasonably Found that Plaintiff Was Under Investigation When He Resigned.

Next, Plaintiff argues that HHS arbitrarily and capriciously concluded that he was under investigation when he resigned. Pl.'s Mem. at 15–30. He contends that the investigation concluded on April 6, 2004—one day *before* he submitted his resignation—when the Medical Center's CEO informed him that his failure to comply with the MEC's recommendations would result in a summary suspension of his staff privileges. *Id.* Plaintiff's argument, however, is contradicted by the clear weight of the evidence, on-point case law, and sound logic.

To clarify, this dispute is not about HHS's definition of the term "investigation"; both parties rely on the definition outlined in the 2001 Guidebook. Per the Guidebook, an investigation is "considered ongoing until the health care entity's decision making authority takes a final action or formally closes the investigation."[3] 2001 Guidebook at E-19. The narrow question presented here is whether the facts support HHS's finding that an investigation was ongoing on April 7, 2004, when Plaintiff submitted his resignation, or whether the facts support that the Medical Center had taken final action before then. *See* Pl.'s Reply at 7 ("The proper inquiry at this point is whether the [HHS's] findings are supported by substantial evidence.").

The record unambiguously supports HHS's conclusion that no final action had been taken as of April 6, 2004, and that the hospital's investigation was ongoing when Plaintiff resigned the following day. Indeed, the CEO's April 6, 2004, letter to Plaintiff states that the MEC's recommendations were subject to change by the Board of Directors and that the Board "*will take final action* on the recommendation of the MEC" if Plaintiff failed to request a hearing within 30 days. J.A. 39 (emphasis added). At the hearing, Plaintiff would have had an opportunity to present evidence and call witnesses to rebut the MEC's findings and recommendations. *See id.* The availability of such hearing demonstrates that the hospital's investigation on the matter was not yet complete. The letter also contemplated additional fact-finding that would inform the hospital's final decision. For instance, Plaintiff was to undergo a "psychiatric evaluation," and was required to authorize the MEC to "communicate with the evaluator" and "receive directly the evaluation report." *Id.* at 36–37. Additionally, the MEC recommended an external quality assurance review of all of Plaintiff's charts, even those that had already been reviewed internally.

---

[3] One court has suggested that the Guidebook does not define the term "investigation," and that the plain meaning of the term—a "systematic examination"—controls. *See Rogers*, 139 F. Supp. 3d at 137. Plaintiff does not question the Guidebook's definition, however. In any event, there is no meaningful daylight between the two definitions.

*Id.* at 37. These planned actions lead inescapably to the conclusion that the Medical Center had made no final decision and was still investigating Plaintiff when he resigned.

Plaintiff counters with a list of selective words and phrases that, he says, demonstrates that the hospital's investigation had ended prior to his resignation. *See* Pl.'s Mem. at 27–29; Pl.'s Reply at 9. For example, he cites several passages in the Ad Hoc Committee's March 16, 2004, letter to the MEC that suggest that the Ad Hoc Committee's investigative activities had come to a close. *See* Pl.'s Mem. at 27. But he ignores the fact that the MEC continued the investigation after the Ad Hoc Committee completed its phase, "carefully review[ing] the extensive history of Dr. Long's disputes with hospital administration" and staff. J.A. 36. Similarly, Plaintiff sees finality in the fact that the MEC's April 5, 2004, letter to the Board of Directors was labeled a "Memorandum Decision," *see* Pl.'s Reply at 11, but he disregards the facts that the MEC asked the Board to "adopt[]" the letter, *see* J.A. 36, and the CEO characterized the actions outlined in the MEC's letter as non-final "recommendations," *see id.* at 39.

Plaintiff also argues that the additional fact-finding activities recommended by the MEC were not part of its investigation, but rather separate, unreportable events. *See* Pl.'s Mem. at 20–26; Pl.'s Reply at 18–26. Putting aside the fact that the investigation would have been ongoing even if the MEC had not recommended additional fact-finding, Plaintiff's attempts to recharacterize those recommendations miss the mark. For instance, Plaintiff argues that the review of his charts was not part of the Medical Center's investigation because it was a "general review of cases," and was "not for a specific patient, specific outcome, or specific concern about his professional competence or conduct." Pl.'s Reply at 18–19 (citing 2001 Guidebook at E-19). Not so. The MEC was tasked with evaluating whether the "significant disruption of hospital services" caused by Plaintiff "could have serious effects on patient outcome . . . as a result of delays in

treatment, and a potentially increased risk for infections." J.A. 33. The MEC accepted the Ad Hoc Committee's recommendation that it order an external review of Plaintiff's charts after concluding that these issues were creating risks to patient safety. *Id.* at 36; *see also id.* at 34. Thus, the review stemmed from specific concerns about whether Plaintiff's competence and conduct were endangering patients; the fact that it included all of Plaintiff's charts did not transform it into a general review. *See Simpkins v. Shalala*, 999 F. Supp. 106, 115 (D.D.C. 1998) (holding that a hospital's review is "routine or general" when it is "no greater than any normal review of a physician's care").

In a similar vein, Plaintiff argues that the recommended psychiatric evaluation was not part of the Medical Center's investigation, but rather a fitness-for-duty evaluation ("FFDE"), which "seeks to determine whether the [doctor] is presently qualified to perform the essential functions of his job." Pl.'s Reply at 22.[4] Citing no on-point authority, Plaintiff contends that an FFDE cannot be an investigation for Data Bank reporting purposes. *Id.* at 23. The HCQIA contains no such exception. It requires health care entities to file reports whenever a physician resigns while under investigation "relating to possible incompetence or improper professional conduct." 42 U.S.C. § 11133. An investigation into whether a physician is "qualified to perform the essential functions of his job," Pl.'s Reply at 22, is clearly an investigation into his professional

---

[4] Plaintiff also notes that HHS did not specifically identify the recommended psychiatric evaluation as evidence of the Medical Center's ongoing investigation, *see* Pl.'s Mem. at 25; J.A. 190. The agency's reasoning, however, is apparent from its repeated references to the psychiatric evaluation and its statement that the entire record, which includes the psychiatric evaluation, demonstrated that the investigation was ongoing. *See* J.A. 189–90; *Domtar Maine Corp. v. FERC*, 347 F.3d 304, 312 (D.C. Cir. 2003) (holding that court may uphold agency's reasoning even if not "explicitly advance[d]" in the underlying proceedings where it "may reasonably be discerned" from the entire record).

competence.[5]  The further fact-finding recommended by the MEC in its April 5, 2004, letter to the Board of Directors, J.A. 36–37, was therefore part of the Medical Center's ongoing investigation.

Trying another tack, Plaintiff proposes a complex syllogism.  He begins with the premise, drawn from HHS's guidance, that "[a]n investigation is considered ongoing until the health care entity's decision making authority takes a final action."  2001 Guidebook at E-19.  A "final action," he continues, is "synonymous with" a "professional review action."  Pl.'s Mem. at 13.  The HCQIA, in turn, defines a "professional review action" to include an "action or recommendation of a professional review body" which is "based on the competence or professional conduct of an individual physician . . . , and which affects (or may affect) adversely the clinical privileges" of the subject physician.  42 U.S.C. § 11151(9).  Because the MEC issued an "adverse recommendation" that Plaintiff's clinical privileges be either voluntarily restricted or summarily suspended, Plaintiff concludes that the hospital's April 6, 2004, letter was a "professional review action," and therefore a "final action" that marked the end of the Medical Center's investigation.  *See* Pl.'s Mem. at 12–15, 18–20; Pl.'s Reply at 8–12.

Plaintiff's argument falters off the block, however, because not every professional review action is a final action that completes an investigation.  HHS's guidance states that "an investigation should be the *precursor* to a professional review action," 2001 Guidebook at E-19 (emphasis added).  It says nothing as to whether an investigation is *concluded* by a professional review action.  To the contrary, professional review actions include decidedly non-final activities, including "recommendation[s]," that "may affect" clinical privileges, as well as any "activity" to "determine whether the physician may have clinical privileges" or to "change or modify such

---

[5] Plaintiff's concern that this interpretation would be unfair to mentally ill physicians and dissuade hospitals from providing mental health services to their employees, *see* Pl.'s Reply at 24–26, cannot overcome the plain text of the statute.  In any event, the concern is unfounded.  The primary focus of the HCQIA is patient safety, which takes precedence over the root causes of a physician's professional misconduct or incompetence.

privileges." *See* 42 U.S.C. § 11151(9), (10). Thus, while a professional review action may, in some circumstances, represent a final action in an investigation, the two terms are not interchangeable.

The only case Plaintiff cites in support of his theory, *Doe v. Leavitt*, does not actually help him. The First Circuit wrote in that case that "an investigation *may* culminate in a professional review action," *Doe v. Leavitt*, 552 F.3d 75, 84 (1st Cir. 2009) (emphasis added). It did not, as Plaintiff argues, hold that a professional review action always concludes an investigation. Moreover, on facts strikingly similar to these, the *Leavitt* court upheld HHS's determination that a doctor was still under investigation when he resigned even though the hospital had taken a professional review action—temporarily suspending the doctor's privileges—prior to his resignation. *Id.* at 77–78, 86. Plaintiff attempts to distinguish *Leavitt* on the ground that the hospital proposed that the doctor be allowed to return to work so long as he agreed to regular proctoring and psychological evaluations, *see* Pl.'s Reply at 16–17, but that is a distinction without a difference. The doctor's suspension was unquestionably a "professional review action," *see* 42 U.S.C. § 11151(9), and yet the First Circuit had no trouble concluding that there had been no "final action" in the investigation when the doctor resigned several weeks later. Thus, *Leavitt* confirms that a professional review action can occur during the course of an investigation without ending the investigation.

Furthermore, Plaintiff's argument would make swiss cheese of the HCQIA's reporting requirements. Here, the Medical Center took at least three professional review actions in the course of its investigation: (1) when the Ad Hoc Committee made an adverse recommendation to the MEC, J.A. 34–35; (2) when the MEC made its adverse recommendation to the Board of Directors, *id.* at 36–37; and (3) when the CEO communicated the MEC's adverse recommendation

to the Plaintiff, *id.* at 38–40. *See* Defs.' Reply in Supp. of Mot. for Summ. J., ECF No. 25, at 3. Under Plaintiff's formulation, each of these actions would have terminated the investigation, opening up multiple, successive windows for Plaintiff to resign without triggering any reporting requirements. These easy escape hatches would significantly undermine Congress's goal of "restrict[ing] the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101(2). Indeed, as the First Circuit explained in rejecting a similar "grudging view of the duration of an investigation," allowing these gaps would "operate at cross-purposes with the goal of the reporting requirement." *Leavitt*, 552 F.3d at 83.

Plaintiff counters that an investigation might never end if it "can be punctuated along the way by adverse recommendations and still be called an investigation." Pl.'s Reply at 14. That concern is addressed in other ways. HHS may void the report if it is clear, upon review, that an investigation was a general review or was undertaken for reasons unrelated to the physician's professional competence or conduct. *See* 45 C.F.R. § 60.21(c)(iv). But the HCQIA does not allow physicians to resign with impunity in order to protect them from the remote risk that they might not know when an investigation had concluded. *See Leal*, 620 F.3d at 1285 ("[T]he Data Bank is not designed to provide protection to physicians at all costs, including the cost of not protecting future patients from problematic physicians.").

Therefore, the MEC's adverse recommendations regarding Plaintiff did not terminate its investigation,[6] and HHS reasonably concluded that the investigation was ongoing on April 7, 2004, when he submitted his resignation.

---

[6] Because the adverse recommendations did not terminate the investigation, the Medical Center's bylaws, which Plaintiff cites as evidence of adverse action, *see* Pl.'s Mem. at 18–20; Pl.'s Reply at 9–11, are irrelevant to the court's analysis.

### C.    Plaintiff Is Not Entitled to Introduce Extra-Record Evidence.

Lastly, Plaintiff argues that the court should allow the introduction of an extra-record declaration by Dr. Lawrence Huntoon, who is purportedly an expert on "peer review activity by health care institutions." *See* Pl.'s Extra-Record Mot. at 1.  When reviewing agency action, the court will "generally consider only 'information that the agency had when it made its decision.'" *Butte Cty. v. Chaudhuri*, 887 F.3d 501, 506 (D.C. Cir. 2018) (quoting *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014)) (cleaned up).  There are exceptions to this rule, but they apply only "to challenge gross procedural deficiencies—such as where the administrative record itself is so deficient as to preclude effective review." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013).

Plaintiff argues that Dr. Huntoon's declaration should be admitted because HHS allegedly "failed to examine all relevant factors and failed to explain adequately its grounds for decision." *See* Pl.'s Extra-Record Mot. at 4.  However, "[a] plaintiff is not entitled to supplement the record merely because she challenges an agency's procedures." *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 41 (D.D.C. 2018).  She "must demonstrate that the evidence is 'needed' by the court to" determine whether the agency action was procedurally flawed. *Level the Playing Field v. Fed. Election Comm'n*, 381 F. Supp. 3d 78, 90 (D.D.C. 2019) (quoting *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010)).  As discussed *supra*, the record contains more than substantial evidence to support HHS's determination.  Plaintiff thus has not demonstrated that Dr. Huntoon's declaration is "needed" to make this determination.  *Cf. Esch v. Yeutter*, 876 F.2d 976, 992 (D.C. Cir. 1989) (permitting extra-record evidence where agency "failed woefully in complying with the hearing requirement" such that "[n]one of the proceedings that did occur was conducted in a manner conducive to obtaining the relevant facts"); *United Student Aid Funds, Inc.*

*v. Devos*, 237 F. Supp. 3d 1, 6 (D.D.C. 2017) (finding that the lack of any evidence on a key issue warranted the introduction of extra-record evidence).

Plaintiff also seeks to use the declaration to bolster his substantive arguments, arguing that the declaration would be useful in "deciding whether the agency correctly . . . evaluat[ed] and decid[ed] the issues presented." *See* Pl.'s Reply in Supp. of Mot. for Leave to Submit Extra-Record Evidence, ECF No. 28, at 2. The mere "[d]isagreement with an agency's analysis," however, "is not enough to warrant the consideration of extra-record evidence." *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 125 (D.D.C. 2017). Because Plaintiff identifies no "gross procedural deficiency" that would preclude effective judicial review, he has not met his burden of justifying the submission of extra-record materials.

## V.    CONCLUSION

For the foregoing reasons, the court grants HHS's Motion for Summary Judgment, ECF No. 18, denies Plaintiff's Motion for Summary Judgment, ECF No. 15, and denies Plaintiff's Motion to Permit the Introduction of Extra-Record Evidence, ECF No. 21. A final, appealable order accompanies this Memorandum Opinion.

Dated: November 15, 2019

Amit P. Mehta
United States District Court Judge